WIBAUX REALTY CO. ET AL., APPELLANTS, *v.* NORTHERN
PACIFIC RAILWAY CO., RESPONDENT.

*Wibaux Flood Cases.*

(No. 7,411.)

(Submitted September 24, 1935. Decided December 23, 1935.)

[54 Pac. (2d) 1175.]

128

*Mr. H. Lowndes Maury* and *Mr. Thomas C. Colton,* for Appellants, submitted an original and a reply brief and argued the cause orally.

*Mr. Frederick D. McCarthy,* of the Bar of St. Paul, Minnesota, and *Messrs. Gunn, Rasch & Hall,* for Respondent, submitted an original and a supplemental brief; *Mr. M. S. Gunn* and *Mr. E. M. Hall* argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

February 4, 1931, the six plaintiffs, all residents of the town of Wibaux, Montana, commenced these actions against the defendant, a railway corporation, by filing complaints in the district court of Wibaux county. By stipulation of counsel it was agreed that the six actions might be tried as one case; separate verdicts to be returned in each. Other cases arising out of the same flood event had theretofore been tried in both the state and federal courts, other actions were pending, and one case had come before this court on appeal. (*Heckaman* v. *Northern Pacific Ry.*

130

*Co.,* 93 Mont. 336, 20 Pac. (2d) 258.) These actions now here came on for hearing before the court and jury, verdicts were returned in favor of the defendant, and judgments thereon were duly rendered and filed. Plaintiffs moved for a new trial, which was denied, and this appeal followed. The appeal is from the judgments.

Plaintiffs allege that on June 7, 1929, each sustained damages from flood waters flowing into and through their respective places of business, destroying personal property and damaging real property as alleged in their respective complaints, and that such damage was due to the negligence of defendant's having erected and maintained its railway embankment through the town, and in connection therewith had erected and maintained over Beaver Creek, a stream flowing through the town, a bridge with an opening thereunder inadequate to permit the timely escape of flood waters, and by reason of such embankment and such inadequate bridge, the flood waters coming down Beaver Creek on June 7, 1929, were retarded and held up to the extent that plaintiffs' property was inundated to a depth of five feet or more, resulting in the damages claimed in the actions.

Defendant answered denying liability; alleging that the flood of 1929 was an unprecedented flood, greater than any that had ever occurred before at that point so far as could be ascertained from any previous record; that the defendant's bridge at the creek crossing at Wibaux had been originally built in 1881 under the supervision of engineers of unquestioned ability, and after careful investigation to determine the requirements of an adequate bridge at that point; that defendant's bridge erected in 1881 had been subsequently improved and its capacity enlarged and had proved adequate for a period of forty-eight years; that plaintiffs would have suffered damage whether there had been any embankment and bridge at that point or not; and that the 1929 flood at Wibaux was an act of God. Plaintiffs replied denying the material allegations of the answer.

Each of the plaintiffs was either engaged in business in Wibaux or possessed property there June 7, 1929, that was damaged by the flood. The main line of the defendant Northern

Pacific Railway Company passes through Wibaux in an easterly and westerly direction. It crosses Beaver Creek, flowing through the town from the south, near the eastern entrance of the railway into the town. The railway grade embankment through the town is approximately fifteen feet above ground level; such grade being necessary to reduce the heavy grade out of town to the west over Beaver hill. The railway bridge over Beaver Creek was constructed in 1881. Subsequent to 1881, the embankment and the bridge were raised about three feet to the 1929 level. An underpass was built through the railway embankment about 1902 on the line of Wibaux Street where United States Highway No. 10 crosses under the railway line at that point.

From the pleadings it appears that plaintiffs attribute the damages alleged to have been sustained solely to the negligence of the defendant, and on the trial of the actions maintained that position. In developing the evidence to establish plaintiffs' causes of action on this theory, it became necessary for plaintiffs to prove, first, that the openings through the railway embankment were not adequate to provide for the timely escape of flood waters; second, that no other cause contributed to plaintiffs' damages. To establish the first proposition it was necessary for plaintiffs to show: (a) That defendant's engineers planned, built and maintained a railway embankment and bridge at Wibaux inadequate to meet the exigencies of the situation, when measured by that degree of skill, care and prudence exercised by engineers of ordinary skill, prudence and care in that line of work; (b) that floods at Wibaux prior to June 7, 1929, had been of such magnitude as to constitute sufficient notice to defendant that the openings in its embankment were inadequate and would naturally result in such damage as it is alleged plaintiffs sustained. To establish the second proposition plaintiffs must (a) overcome the evidence produced by defendant to sustain its allegation that the flood of June 7, 1929, was an unprecedented flood, "An Act of God"; (b) overcome the evidence produced by the defendant to sustain its allegation that plaintiffs would have suffered damages from the 1929 flood whether the railway embankment had been there or not.

Many of the questions of law involved in the actions at bar were determined by this court in the *Heckaman Case,* supra, and our principal problem here is to determine whether there is substantial evidence in the record to sustain the verdicts.

It must be kept in mind that the actions at bar involve the review of judgments founded upon verdicts returned by a jury, and in such review this court, so far as the facts are concerned, is confined to the determination as to whether there is substantial evidence in the record to support the verdicts. It is not a question as to what we here may think as to the preponderance of the evidence or its credibility. Such conclusions are for the jury. This phase of the matter will be more fully adverted to in the consideration we shall presently give to the *Heckaman Case* in comparing the questions decided in that case and their bearing upon the questions in the actions at bar.

We will first consider the fourteen specifications of error assigned by plaintiffs in the order presented and on the grounds argued in their brief, but the assignments numbered from 1 to 4 deal with the question of defendant's negligence, and in addition to specific objections of counsel to such assignments the consideration of the actions in their entirety necessarily involves the question of negligence raised in these four assignments.

Assignment of error No. 1 is founded upon the court's instruction No. 7. The only criticism of this instruction by counsel for plaintiffs in their brief is on the point that it invades the province of the jury, in that the jury were instructed that their conclusions must be based upon the facts shown by the evidence and not upon inference or conclusions based upon inferences or conclusions. This is decided by statute. A presumption is a deduction from a fact proved (sec. 10602, Rev. Codes 1921); an inference must be founded on a fact legally proved and upon such a deduction from that fact as is warranted (sec. 10603). If counsel's contention, that "the instruction is as erroneous as it is old," is correct, then the statute necessarily must be erroneous. This is the effect of plaintiffs' argument and contention on the point that this particular instruction is erroneous. The instruction follows the injunction of the statute, and was not error.

(See, also, *First Nat. Bank* v. *Sorenson*, 65 Mont. 1, 210 Pac. 900; *Kern* v. *Payne*, 65 Mont. 325, 211 Pac. 767, and cases cited; *Doran* v. *United States Building & Loan Assn.*, 94 Mont. 73, 20 Pac. (2d) 835.)

Assignment No. 2 is that "the court erred in giving * * * ▓▓ instruction No. 9." In the *Heckaman Case*, supra, defendant offered, and the trial court refused to give, a somewhat similar instruction. Defendant on appeal in that case assigned the court's refusal of that instruction as error. This court there, after reciting the instruction, said, 93 Mont. 363, at page 385, 20 Pac. (2d) 258, 265: "The offered instruction is substantially a correct statement of the law, but, in so far as it is correct, it is covered fully by instructions given, and, therefore, its refusal does not constitute reversible error." The court in the Heckaman opinion then suggests such changes in the instructions, if used in future actions, as were necessary to correct certain minor defects pointed out. We see no material difference between the instruction under consideration here and the instruction referred to in the *Heckaman Case* as above. Counsel contends that this instruction is erroneous in the use of the phrase "under like circumstances," and argue: "It is not a question whether the defendant employed civil engineers of at least ordinary skill and ability * * * . It is a question of what ordinary prudent people in the same line or similar lines of business would do. * * * " In substance, the instruction counsel contend for would hold defendant liable without allowing the history of the stream or of any flood prior to 1929 at Wibaux to be considered. In our opinion, these are the most essential elements that could be employed to measure the skill, care and prudence necessary in the premises. From such sources the knowledge is acquired by which the essential degree of care, prudence, and skill is measured. Counsel would hold defendant liable because it did not anticipate and foresee the magnitude of the 1929 flood and provide to meet it. If that were the law, defendant would be liable regardless of the magnitude of any flood or whether any degree of prudence or care that might have been exercised were equal to the emergency or not. In short, the defendant's

care and prudence would be measured by the exigencies of the 1929 flood and it would become liable as an insurer in place of the law which holds it liable only for ordinary care measured by the accepted meaning of that term. It is axiomatic that a defendant in the position of the defendant here is not an insurer against every contingency. Otherwise, there would be no occasion to establish rules as to what constitutes ordinary care and prudence. The instruction is consonant with law.

Assignment No. 3 is that "the court erred in giving defendant's instruction No. 11, court's instruction No. 4." Instruction No. 4 is as follows:

"A watercourse or stream is the channel cut by running water with well defined banks and bottom thru which water flows for substantial period of each year.

"In constructing a railway bridge, the law does not require that the full width of such channel be left open, but only that the watercourse be restored to its original state of usefulness, as near as may be. The phrase 'as near as may be,' as used in this law, does not mean 'as near as might be possible.' It contemplates some variation from the original condition of the stream and allows some discretion in the engineers of the railway company in constructing a bridge to make such reasonable changes in the flow of the water therein as they find necessary in constructing a safe and practical bridge over the stream.

"Even if you find from the evidence that the channel was somewhat narrowed by the bridge, as constructed in 1896 and raised in 1898, but also find that the channel was then, and thereafter, straightened and deepened, so that it still carried off all the water which could have been reasonably anticipated by the exercise of ordinary foresight and prudence, including the ordinary flood waters, without any more interference with the flow thereof, than was reasonably consistent with the right granted the railway company to construct a safe and practical bridge over such stream, then you are instructed that there was no unlawful interference with the watercourse or channel of the stream by the defendant, and that it cannot be held guilty of negligence

in the construction and maintenance of such bridge over the stream as it existed prior to June 7, 1929.''

Counsel in their brief limit their criticism of this instruction to the part, ''It contemplates some variation from the original condition of the stream and allows some discretion in the engineers of the railway company in constructing a bridge''; and it is further contended that the instruction is misleading. Here again a careful analysis of the instruction and pertinent parts of the opinion in the *Heckaman Case* establishes the fact that the instruction is predicated on what was said in part by this court in that case. We think the instruction embodies a substantially correct statement of the law.

Assignment No. 4 is founded on instruction No. 5, which is as follows: ''If you find that the openings in said embankment were large enough to handle in a reasonable manner the flood waters of Beaver Creek, prior to June 7, 1929, and that they did not impair the usefulness of the stream to a greater extent than was reasonably necessary in order to construct a safe and practical bridge, and further find that the flood of June 7, 1929, was an unusual, excessive and extraordinary flood, which could not have been reasonably anticipated by the exercise of ordinary foresight and prudence, then you are instructed that the fact, if you find it is a fact, that the openings in the embankment as they existed on June 7, 1929, were not large enough to properly carry off the water in Beaver Creek on that date, would not render the defendants liable for damages resulting from such impounded water.''

Counsel contend that the word ''alone'' should have been inserted before the word ''render'' in the second line from the bottom. No other error is predicated on this instruction. We think the meaning of the instruction would be practically the same either with or without the added word. The change in the instruction is contended for ''for the reason that there may be negligence in the original construction of the bridge,'' and it is contended that defendant's witnesses Blum and Murray showed that the ''original construction was negligent.'' Just where in the record the testimony of these witnesses confirms counsel's

contention on this point is not pointed out, and we are unable to find it. On the contrary, both of these witnesses testified that the bridge was adequate and that a bridge of that capacity was approved by both of them.

The instruction takes the record of the flood waters of Beaver Creek at Wibaux prior to June 7, 1929, as the standard by which defendant's care and prudence in building and maintaining its bridge is measured. We think counsel for plaintiffs conceded this to be a fair application of the law when they agreed with counsel for the defendant that the jury should not take into account the fact that defendant, taking warning from the 1929 flood, built a 270-foot bridge at Wibaux subsequent to that flood. We know of no standard by which bridge builders or others may be guided in determining the adequacy of a bridge over any stream to take care of flood waters, except the drainage area of the stream and the evidence and the record of previous floods. We find no error in the instruction.

Assignment No. 5 is as follows: ''The court erred in overruling plaintiffs' motion to require the defendant to submit an itemized statement of all its expenses in connection with the trial of said causes.'' It is obvious that this assignment of error springs from the suspicions of counsel for the plaintiffs that money was improperly used by the defendant to obtain the verdicts. The motion was overruled by the court. Counsel in their brief mention a verdict obtained by ''corruption,'' but the merits of this assignment of error are not forcefully argued and counsel's contentions appear to be founded more on suspicion than facts, and the assignment does not merit extended consideration here. We will add, however, that color is given to plaintiffs' suspicion to some extent by the affidavits of certain jurors and other parties about what was said by this party and that during the trial, but the counter-affidavits filed by defendant, some of them by the same parties who furnished affidavits for the plaintiffs, destroy to a great extent the force and effect of the prior affidavits. The suggestive remarks alleged to have been made by some jurymen about the source of the liquor one juryman displayed, and about the probable entertainment of some jurymen

in the private car of the officials of the defendant, are just such remarks as may be heard under similar circumstances in any group of persons, and too much weight cannot be attributed to passing remarks expressed under such circumstances. From the remarks as given in the record, they could very well have been made without any ulterior or improper motive or knowledge, and this court must accept the statements of defendant's counsel that they knew nothing whatever about any of these matters, and had nothing whatever to do with them if they were true, and the truth is specifically denied. Furthermore, this matter was argued to the trial court on the motion for a new trial and its denial of such motion is in the nature of a finding of fact which will not be disturbed here, where no showing is made of an abuse of discretion. The fact that some of the jurors had liquor and treated some of their friends on the jury is admitted, but there is nothing in the record to connect the defendant with such act or acts. The fact that jurymen feel it necessary to have liquor or to treat their friends associated in jury service should not be permitted to reflect upon a party to the action, unless the party litigant is shown to be culpable. Jurymen as well as others possess certain liberties of action that no one can control, and if events of this kind were permitted to destroy the conclusions of a jury and the judgment of the court after a long and arduous trial, litigants might deliberately destroy the fruits of a careful and long-drawn out action in any court by obtaining the co-operation of a single juryman. It is not reasonable to expect men on jury service to deny themselves all the privileges and practices they are accustomed to indulge in daily life. The excessive use of intoxicating liquor by jurymen while on duty would not be tolerated; but there is no evidence before us that tends to establish excessive use by any juryman. The state is engaged in dispensing intoxicating liquor. Its consumption is not illegal, and we have no control over its use, unless it is shown that such use has led to the miscarriage of justice in an action at law under review here. No such showing is made in the record.

In one instance it is alleged in an affidavit presented by the plaintiffs, and admitted by counsel for the defendant, that one witness was paid more for his services than the law provides. This payment in the sum of $40 was not made, however, until after these actions were tried, the verdicts returned, and the judgments entered, and it is clearly set out by affidavit of the witness that it was to reimburse that witness for extraordinary expenses necessary for him to incur in order to be at hand and give his testimony. The payment of witnesses by litigants of any amount in excess of what the law provides should be scrutinized critically in every instance and is not to be encouraged; but where, as here, the money is paid after the trial without any prior promise and particularly in this instance where the testimony that the particular witness gave was simply cumulative on questions that had been testified to by numerous other witnesses, we do not think it is of such irregularity and importance as to justify setting aside a verdict.

For the reasons stated, we think the action of the trial court in overruling plaintiffs' motion to require the defendant to submit an itemized statement of all expenses in connection with the trial of the causes was not error.

Assignment No. 6 is that "the court erred in denying plaintiffs' motion for a new trial in said causes." Plaintiffs based their motion for a new trial substantially upon the grounds enumerated in section 9397, Revised Codes 1921, but their affidavits in support of the motion and the argument thereon are directed to what counsel characterized in their brief as "corruption" and referred to in the oral argument as "embracery." This logically brings the consideration of the motion under subdivision 2 of section 9397, "Misconduct of the jury," and, in a measure, under subdivision 1, relating to causes assigned depriving a party of a fair trial. What has been said on assignment of error No. 5 applies with equal force here, and we think sufficiently covers the merits of the motion in so far as the subdivisions mentioned are concerned. Subdivisions 6 and 7, relating to insufficiency of the evidence to justify the verdicts and errors of law excepted to, are fully covered under other assign-

ments considered and in this opinion as a whole. The rule is established in this jurisdiction that the power to grant or deny a motion for a new trial is within the sound legal discretion of the trial court (*Brunnabend* v. *Tibbles*, 76 Mont. 288, 246 Pac. 536), and its action will not be disturbed unless there has been a manifest abuse of discretion. (*State* v. *Anderson*, 92 Mont. 313, 13 Pac. (2d) 228.)

Assignment of error No. 7 is as follows: "The court erred in giving instruction No. 10." The record shows that this was plaintiffs' proposed instruction No. 7 given by the court *verbatim* without objection by defendant, and necessarily plaintiffs are foreclosed from assigning error based thereon.

Assignment No. 8 is founded on alleged error in giving instruction No. 11. The record shows this instruction was plaintiffs' proposed instruction No. 9, given as proposed, but over defendant's objection, and the plaintiffs, as in assignment No. 7, are likewise foreclosed from assigning error thereon.

Plaintiffs in their brief set out a second assignment of error No. 8 which will be designated No. 8A. This assignment is grounded upon "the court erred in sustaining the defendant's objection to the offer of testimony of the witness Rife. Plaintiffs offered to show by the witness Rife that the cause of the waters being driven into the town was the embankment of the railroad and the shortness of the railroad bridge." The offered testimony of this witness which was excluded by the court's ruling is more an announcement of a conclusion than the statement of a fact. The testimony of witnesses, except qualified experts, must be confined to giving facts and leave conclusions to be drawn therefrom to the jury, unless it is shown that the particular witness is, by experience or otherwise, qualified to give expert testimony in response to the questions asked, and the question must be one involving matters too complex to be readily grasped by the average mind; must relate to a matter that involves technical training. The witness did not qualify as an expert. Furthermore, the answer to the question asked deals with one of the vital questions in issue, and the answer to it we think comes within the particular province of the jury. On this phase of the question

we think the general rule as stated in 22 C. J. at page 485, applies, where it is said: "The normal function of a witness is merely to state facts within his personal knowledge, and under ordinary circumstances, his opinion or conclusion with respect to the matters in issue or relevant to the issue cannot be received." The reason given for the rule, at page 502, is that "as the opinion evidence rule is to provide against the mischief of the invasion of the province of the jury, a court should, as far as possible, exclude the inference, conclusion or judgment of a witness as to the ultimate fact in issue." Witnesses qualifying as experts in particular professions or business are excepted from the rule. (22 C. J. 639.) The ruling of the trial court in excluding the particular testimony is sustained.

Assignment No. 9 is founded on offered testimony of the same witness referred to in No. 8A, and excluded by the court on defendant's objection. The question asked Rife by counsel referred to under 8A above and the question asked here called for the same answer. It was an attempt by counsel to get to the jury testimony already excluded by the court's previous ruling.

Assignment of error No. 10 is as follows: "The court erred in ▮▮ ▮▮ sustaining objection to the testimony of the witness Rife in connection with the 1907 flood." It is argued by counsel that "plaintiffs had a right to show the extent of the 1907 flood. The answer of the defendant sets up an unprecedented flood. By this witness we could have proved that the 1907 flood was a greater flood than the 1929 flood." There is ample evidence in the record to determine the extent of any known flood prior to 1929 at Wibaux, and whether the exclusion of this particular testimony on the part of the court was error or not does not materially affect the result and may be classed as harmless, if error at all. Unless there is prejudicial error in the exclusion of evidence, a judgment will not be reversed. (*Johnson* v. *Blyberg*, 82 Mont. 336, 266 Pac. 1103.) We are further of the opinion that this is an instance that comes within the discretion of the trial court to limit the number of witnesses that may be called to testify to the same fact. (*Hoskins* v. *Northern Pac. Ry. Co.*, 39 Mont. 394, 102 Pac. 988; *Southern Pacific Co.* v.

*Marquez,* (C. C. A.) 44 Fed. (2d) 286), and that in any event plaintiffs suffered no prejudicial error by the court's ruling.

Assignment of error No. 11 is as follows:

"The court erred in sustaining the objection to the offer of testimony of the witness K. M. Orgain. The plaintiffs offer to prove by the witness K. M. Orgain, that on April 3, 1923, the witness as town clerk, was instructed by the town council to draw up a resolution asking the N. P. Ry. Co. to ~~widen the~~ (line drawn through the last two words in minute book) provide a larger waterway under the bridge over Beaver Creek and that within 2 or 3 days thereafter he mailed a letter telling the division superintendent of the railway the contents of this resolution.

"Mr. Maury: We offer the testimony.

"Mr. McCarthy: We renew our objection.

"The Court: I will sustain the objection.

"Mr. Maury: We note an exception."

Orgain, in testifying, was permitted to read from the minute entry in the records of the town council, made by him when he was clerk of the council, by which Orgain was instructed, as clerk, to draw up a resolution asking the defendant to provide a larger waterway under the bridge of Beaver Creek. No minute entry was offered in evidence to show the resolution was ever drawn up or that it was ever submitted to the council or the defendant advised thereof, but plaintiffs' offer above was made to have Orgain testify that he wrote the defendant's officials about the resolution. The witness was not certain that he did write defendant, but testified he must have done so, as it was his custom to do all such things as directed by the council to do. It will be noted that the text of the minute entry does not direct the clerk to submit any resolution to the defendant, but to "draw a resolution." There is nothing in the record to show that the resolution was ever drawn, proposed, adopted or sent. The witness had testified that he was not certain he wrote the defendant, but assumed he did as instructed. The obvious purpose of the offered testimony was to show that notice had been brought home to the defendant of the inadequacy of its bridge, but even if it were established beyond question that the defendant had

been given ample notice of the council's opinion of the bridge it would conclude nothing. Whether the bridge were adequate or not would still be an open question and a question that could be determined only by competent evidence of a technical nature. The exclusion of the testimony was not error.

Assignment of error No. 12 is as follows: "The court erred in sustaining the objection of the defendant to the testimony of Lillis, an engineer for the defendant." The record, on the cross-examination of Lillis, shows the following:

"Q. [By Maury] And if some of it [water] was coming from the north towards the south at that time, it would not make any difference in your computations?

"Mr. McCarthy: Objected to as an assumption not based on the evidence. The evidence now is that the water was all flowing north, and continuously flowing north.

"Mr. Maury: No, the evidence is, it was flowing in many directions, part of it flowing east with the Methodist parsonage, part of it flowing south with the chopping block into Manning's building, and flowing every direction.

"The Court: I will sustain the objection."

The obvious purpose of this line of examination, frequently used in the examination of witnesses in these actions, was to show that the railway embankment so obstructed the water's escape as to cause it to flow south in Beaver Creek at Wibaux on June 7, 1929. By another witness it was attempted to show that a barrel in the Davis addition was floating south, and by another that some heavy object was thrown against the north door of one of the buildings in the line of the flood with such force as to crash the door in. It is a matter of common knowledge that any flow of water, except where the channel of the stream is straight and free from obstructions, causes eddies to form which will frequently carry water and floating objects in the opposite direction. The record here shows the main body of water in Beaver Creek on June 7, 1929, was flowing generally north with tremendous force and violence, and it was useless to encumber the record with evidence to the contrary. We do not think this assignment is worthy of serious consideration.

Assignment No. 13 is as follows: "The court erred in excluding 29 photographs presented for identification to Sloan, the general manager of the defendant railway company, in connection with views of the 1921 flood along the Northern Pacific line within thirty-five miles of Wibaux." The photographs referred to were flood scenes along Andrews Creek that affected the defendant's roadbed for a distance of from 22 to 35 miles east of Wibaux in 1921. We can see no evidentiary value that these photographs would have, except to possibly show that this evidence of floods from 22 to 35 miles east of Wibaux eight years prior to the 1929 flood was notice that defendant's bridge at Wibaux was inadequate. We think the connection is too remote, both in time and distance, to constitute evidence of anything relative to the flood of 1929 at Wibaux.

Assignment of error No. 14 is as follows: "The verdicts are all contrary to unfailing natural laws. A stream 600 feet wide, 11.5 feet deep, cannot be 21 feet high and 2,600 feet wide without obstruction. The evidence is therefore insufficient to sustain the verdicts." This assignment is more in the nature of an argument by counsel than a specification of error in law, and moreover is founded, in part, upon testimony admitted later in the record to be erroneous. The only place where Beaver Creek was shown to be only 600 feet wide during the 1929 flood, and 11.1 feet (not 11.5 feet) deep, was at Massey's. Engineer Lyman, at page 365 of the record, testified to the width and depth as above, but at pages 425 and 432, Lyman, after new measurements were taken jointly by Lyman and Oien at the point indicated, admitted that Oien was correct and that he accepted Oien's measurements. Oien testified that the depth of the high water at Massey's in 1929 was 14.5 feet. Obviously counsel predicated his argument on testimony admittedly incorrect. We believe this assignment to be without merit.

The respective province of the jury and the court was considered at length in the *Heckaman Case,* supra. Certain conclusions in that case also bear upon questions raised in plaintiffs' assignments of error 1 to 4, heretofore adverted to, and we deem

it advisable to review the opinion in the *Heckaman Case* at this time along with the questions now under consideration.

Counsel for the plaintiffs contend with great vigor that as this court sustained a judgment in the *Heckaman Case* founded upon a verdict for the plaintiff growing out of the same flood, we must necessarily reverse the trial court in the actions at bar. The testimony on behalf of the plaintiffs here was along the same lines as that introduced in the *Heckaman Case*, and numerous decisions cited there are applicable here, although in certain particulars certain of the witnesses for the plaintiffs were not as positive in their statements here as on the former trial. Yet, had the jury here returned verdicts for the plaintiffs, the evidence in their behalf is probably sufficient to sustain such verdicts. But we are not called upon to decide that question at this time.

In the *Heckaman Case*, being the first of the series of causes arising out of the flood of 1929, the defendant made no great effort to controvert the evidence on behalf of the plaintiff with regard to the showing that the bridge opening was insufficient to accommodate seasonably recurring high water, and that this fact was brought home to the defendant's officials by notice and was known to the defendant. Rather, the defendant sought there to establish nonliability notwithstanding the fact, as a matter of law, by reliance upon three defenses interposed, viz.: ''That, as the embankment had existed since 1898 in the condition it was in at the time of the damage, the negligence charged dated back to the time of construction, and plaintiff's action was barred by the statute of limitations; that, as plaintiff acquired his property with knowledge of the existence of the embankment, he cannot recover; and, third, that the flood of 1929, was unprecedented, an act of God, for which defendant could not be held liable.''

This court having held against the defendant on each of these defenses in the *Heckaman Case*, defendant exerted every effort to overcome the case made by the plaintiffs in the cases at bar. The present record contains substantial evidence to warrant a finding that the bridge opening had taken care of all prior floods;

that, at the time of the consultation between Wibaux officials and citizens with Rapelje, general manager of the defendant company, which, in the *Heckaman Case,* was held to show knowledge on the part of the defendant of the insufficiency of the bridge, the question of providing a bridge of greater capacity was not suggested or discussed; nor is it clearly established that there was brought home to the defendant any complaint of any inadequacy of the bridge; and, finally, that the damage of which complaint is made resulted by reason of an unprecedented flood, "a wall of water, inundating the town before it reached the railway embankment." The defendant's case as to the magnitude of the 1929 flood in the cases at bar is much stronger than in the *Heckaman Case.* This new line of defense resulted in verdicts for the defendant; the verdicts were approved by the trial court in ruling on plaintiffs' motion for a new trial. This must be borne in mind in considering the assignment that the evidence is insufficient to warrant the verdicts.

We have heretofore held that "the fact that this court might have made a different finding on the evidence is not sufficient to warrant disturbing a verdict which has been approved by the trial court in denying a new trial." (*Simpson* v. *Miller,* 97 Mont. 328, 34 Pac. (2d) 528, 529.) And again we have said that: "We are bound by the following well-established rules circumscribing our right to review the evidence: So long as we retain the jury system and our present statutory provisions with regard thereto, courts and litigants must abide by the decision of the jury respecting the weight of evidence and the credibility of the witnesses; these are matters with which this court, on appeal, has nothing to do. (*Chicago Title & Trust Co.* v. *O'Marr,* 25 Mont. 242, 64 Pac. 506.) A jury may believe the testimony of one witness and disbelieve that of another, or any number of others, and the determination of the jury in this regard is final; having spoken, this court must assume that the facts are as stated by the witnesses believed by the jury, and claimed by the prevailing party. (*Hanson Sheep Co.* v. *Farmers' etc. State Bank,* 53 Mont. 324, 163 Pac. 1151; *Watts* v. *Billings Bench Water Assn.,* 78 Mont. 199, 253 Pac. 260.) The preponderance

of the evidence may be established by a single witness as against a greater number of witnesses who testify to the contrary. (*McQuay* v. *McQuay*, 81 Mont. 311, 263 Pac. 683.) It follows that wherever there is a conflict in the evidence this court may only review the testimony for the purpose of determining whether or not there is any substantial evidence in the record to support the verdict of the jury, and must accept the evidence there found as true, unless that evidence is so inherently impossible or improbable as not to be entitled to belief; and, where a verdict is based upon substantial evidence which, from any point of view, could have been accepted by the jury as credible, it is binding upon this court, although it may appear inherently weak. (*Williams* v. *Thomas*, 58 Mont. 576, 194 Pac. 500.) Where the evidence is conflicting but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal, and this is especially true when the court, as here, has passed upon the sufficiency of the evidence on motion for a directed verdict and motion for a new trial and upheld its sufficiency. (*Bank of Commerce* v. *United States Fidelity & Guaranty Co.*, 58 Mont. 236, 194 Pac. 158.)'' (*Wallace* v. *Wallace*, 85 Mont. 492, 279 Pac. 374, 377, 66 A. L. R. 587.)

While the *Heckaman Case* and the cases at bar arose out of the same flood event, an assumption that where two or more actions growing out of the same event come here for review this court in each subsequent action must follow its former ruling is necessarily founded on the further assumption that the issues raised and the questions involved are identical in each subsequent case. The result would be that in circumstances such as here where a litigant is defendant in numerous actions he would be concluded in all by the court's ruling in the first action heard. We think this statement is sufficient to suggest the fallacy of any contention as to what this court's decision should be in the cases at bar when considered in connection with the *Heckaman Case*. That case is a precedent here on the rulings of the court on the record of the issues as contained therein. Each case must stand or fall on its own record.

In reviewing the record, we note that nearly all the testimony of the lay witnesses relates to the question of the 1929 flood as compared with prior floods at Wibaux and vicinity, and the actions of the water in the 1929 flood. The record shows testimony of witnesses for the plaintiffs tending to support the contentions of the defendant as follows: R. V. Massey, a rancher living at the bend in Beaver Creek about three-quarters of a mile south of Wibaux, testified that the water "swept" over the bank near his residence and swept through the town between the water tank and Wibaux Street. This course would take the flow directly into the locality of the plaintiffs' property. The witness saw no backing up of water, as contended for by plaintiffs, but "it was running practically due north; it was moving right fast." He saw debris, sheep, other animals and things going down the stream, and he found 14 dead sheep on his place after the flood subsided. "There was quite a current there. I didn't see any cessation there or any backing up of the water there any time." The water quit coming over the bank about noon and by 3 o'clock it had begun to subside, and by midnight it was 3 feet below the bank.

O. S. Drake, Charles E. White, editor of the local newspaper, and Arthur Bradley, county commissioner, other witnesses for plaintiffs, gave testimony favorable in part to defendant. A current copy of White's paper is in evidence in which he refers in large headlines to the "wall of water."

Numerous witnesses living in Wibaux and as far as 36 miles up the Beaver Creek valley testified for the defendant as to the flood situation in their respective localities.

John Effa, living 22 miles south of Wibaux, was in town wtih his wife and on starting home was blocked by high waters; remained overnight at the Wicks place and during the night had to leave the house and go to the barn which was on higher ground. "It didn't rain; it was water pouring." He and his wife slept in the manger in the barn the rest of the night; when he went out in the morning about 6 o'clock, looking to the south he saw a wave of water he judged was about 6 feet high; he hurried in and got his wife into the barn loft, and soon after

they got up there, there was 4 feet of water in the barn. The wave of water took all the small buildings away, including a granary 36x16 feet containing about 1,000 bushels of grain; 38 steel fence posts inclosing one of the fields were broken off even with the ground.

W. M. Combs flew over the flood area in a plane at an altitude of about 1,000 feet; he testified that he had a particularly good view of the valley and the flood, and as he approached Wibaux from the east he thought that Beaver Creek was the Missouri River; that the water did not follow the bends in the creek, but came straight down the valley, and was moving very fast.

Sixteen other witnesses living at various points south of Wibaux along the Beaver Creek valley gave testimony of substantially the same tenor as that of Effa and Combs. No less than nine witnesses living in and around Wibaux and at various points as far as 26 miles up the valley, in describing the flood, refer to the walls of water. Some use the term "rolls," others "waves," but the description of all the witnesses was to the effect that there were two or three distinct and sudden rises of the water of such magnitude as to call for some such description as that employed. The testimony of all these witnesses strongly tends to support the fact that there was a very heavy rainfall, accompanied in many localities by hail on all the 22 tributaries of Beaver Creek above Wibaux on the afternoon of June 6 and the early hours of June 7; that it was a flood of greater height and magnitude than had ever been witnessed by any of the people along the valley, and many of them had resided there for 25 years or more; that the water ran down the valley in such volume that houses and other buildings, livestock, heavy farm machinery and debris of various kinds were swept down the stream with remarkable force; and that the height of the water in Wibaux was no greater than it was at many points south along the stream where the elevation of the ground and other conditions were similar.

There is testimony by witnesses for plaintiffs in direct conflict with much of the testimony of defendant's witnesses as here outlined, but such conflicting testimony does not materially impeach

the testimony outlined above, nor does the conflicting testimony justify the conclusion, so far as this part of the evidence is concerned, that there was no substantial evidence to support the verdicts rendered. This far the testimony tends to establish the defendant's contention that the flood of June 7, 1929, was an unprecedented flood; it is sufficient, if believed, to convince the reasonable mind that the channel of Beaver Creek which controls the ordinary flow of water in the stream had very little effect upon this particular flood, and that the only thing that kept the flood waters within any bounds was the hills and elevation of the ground along the boundaries of the valley itself. It further tends to establish the contention, by substantial evidence, that there were "walls of water" coming down at the peak of the flood, and that the flood was of such unusual proportions that it may be properly described as "an act of God." The phrase "an act of God" is not, of course, to be accepted in a legal sense as a special dispensation of Providence, but rather as an unusual or unprecedented happening or event arising within the realms of natural law, but beyond and outside of the observations and experience of the average person. An "act of God" is recognized as an adequate defense under certain circumstances by our statutes (secs. 7452, 7867, Rev. Codes 1921), and by this court. (*Heckaman* v. *Northern Pacific Ry. Co.*, supra; *Walsh* v. *East Butte Copper Min. Co.*, 66 Mont. 592, 214 Pac. 641; *Lyon* v. *Chicago, Mil. & St. Paul Ry. Co.*, 45 Mont. 33, 121 Pac. 886.)

We now come to the consideration of the expert witnesses; R. A. Lyman, for the plaintiffs, and John Oien, M. W. Beach, William L. Darling, Edward E. Baer, M. F. Clements, B. C. Lillis and Samuel Murray for the defendant. The persons here named were qualified, as it appears in the record, both as to academic study and by extended experience, to give testimony on the matters about which each was examined. The conclusions of these experts are in conflict in some particulars, but, analyzing their testimony as a whole, we are able to arrive at a reasonably fair estimation of its value.

It is obvious that in any determination of the actions of the flood waters after they passed the Massey place south of town,

the relative measurements of the flood at Massey's, measurements of the channel of the creek through the town, and the measurements of the openings in the highway grade and the railway embankment, are essential as a basis in forming any conclusion as to what happened after the flood waters passed Massey's and before they escaped through the railway embankment. For evidence on these points we are dependent almost entirely on the testimony of engineer Lyman for the plaintiffs, and engineers Lillis and Oien for the defendant. The three agree that the width of the flood stream at Massey's was 600 feet; depth, Lyman 11.1 feet, Oien 14.3, Lillis, not given. The depth was rechecked at the time of trial by Lyman and Oien, and Lyman admitted an error in his figures of 3 feet and accepted that of Oien; velocity, Lyman, 5 or 6 miles per hour, 8 or 9 feet per second. Lillis and Oien not taken. Later Lyman changed this to 3 miles per hour, and 4.19 feet per second; volume of water passing Massey's, Lyman "it couldn't be more than 30,000 cubic feet per second." Later given by Lyman positively at 15,803 cubic feet per second. It is to be noted here that Lyman first testified that the velocity at Massey's was 8 to 9 feet per second. Both Lyman and Lillis used the following rule to determine the total volume in cubic feet per second passing a given point: The area in square feet of the cross-section multiplied by the velocity in feet per second gives the total cubic feet per second. Lyman testified the area of the cross-section at Massey's was 3,774 square feet. Accepting this area of the cross-section as correct, if the velocity were 8 feet per second, the cubic feet per second flowing past that point would be 30,192; if the velocity were 9 feet per second, the cubic feet would be 33,966. The later change in the velocity to a "little less" than 3 miles per hour, and to 4.19 feet per second by Lyman, would give a total of 15,803 cubic feet per second. A comparison between some of these estimates and logical conclusions to be drawn therefrom we think is pertinent here. Lyman gives the velocity of the water at the county bridge at 12 feet per second in the creek channel, and 5.5 feet in the low place in the highway grade where the water found an outlet in part. If the water was moving 12 feet per second at the highway bridge

at the southeast corner of the block in which property of a number of the plaintiffs was located, the "lake" condition of the water in that locality as contended for by counsel for plaintiffs is without merit. Lyman testified that the water velocity through the railway bridge was 27 feet per second. The square feet area of the railway bridge is given as approximately 1,335; the county bridge, 600 feet south of the railway bridge, an area of 975 square feet. The railway bridge provides, according to these figures, an escape for 36,045 cubic feet of water per second; the county bridge an escape for 11,700 cubic feet per second, the water passing under the county bridge at a velocity of 12 feet per second and under the railway bridge at 27 feet per second. Such are the results obtainable from the estimates given by plaintiffs' engineer. The relative capacity for escape of water through the railway embankment and under the highway bridge here given does not take into account any water that escaped by way of the underpass through the railway embankment and over the low place in the highway grade east of the highway bridge, both of which furnish escape of considerable water in addition to that flowing under the respective bridges.

Defendant's Exhibit Y-31, admitted without objection, is a cross-section of Beaver Creek from the top of the high water of June 7, 1929, down to the ground level. This cross-section is 3,000 feet south of the main line of defendant's railway, and 600 feet north of Massey's. Oien prepared the Exhibit Y-31, and gives the area of the cross-section as 9,271 square feet, and the volume of water flowing past that point at the peak of the flood is stated by Lillis to be about 36,000 cubic feet. If Lillis' conclusion is approximately correct that there were 36,000 cubic feet per second passing the point 600 feet north of Massey's, and Lyman is approximately correct that the velocity of the water at the railway bridge was 27 feet per second, we do not see how it is possible to escape the conclusion that the railway bridge was adequate to take care of the flow of water coming into that section of the valley between Massey's and the railway embankment in which the town is located. If we accept Lyman's corrected conclusion that only 15,803 cubic feet per second was passing

Massey's this would indicate that the flow at Massey's would not seriously tax the capacity of the waterway under the bridge. We think the only logical conclusion is that the history of the flood to the south of Wibaux, as verified by numerous witnesses, shows practically all places in the valley of an elevation similar to that of Wibaux were under water to approximately the depth it reached in and around plaintiffs' property, and necessarily plaintiffs would have suffered damage whether the railway embankment had been there or not. It is not reasonable to assume, as plaintiffs have, that the highway grade and contour of the terrain immediately south of the main part of the town did not retard the escape of the flood waters but the railway embankment did. Such, obviously, were the conclusions of the jury.

The testimony of engineer Lillis presents the flood situation at Wibaux in such a manner that we deem it worthy of repetition here in part. The substance of his testimony on the magnitude of the 1929 flood is as follows:

"There has been some talk here during the trial of this case about how much water, cubic feet per second, passed any given point during that flood when at its maximum. I made computations to ascertain the cubic feet per second of the water. I just happened to take the section where the pointer is now resting upon the relief map, called Section 6, and that is a point where Mr. Oien had determined the high water marks on either side of the valley. I checked the computations and the area of that water section there, between the ground and the high water it was 9,271 square feet. Now, to get the quantity of water flowing by a point, you have to have the area of its cross-section and you have to have its speed. The quantity is usually given in terms of cubic feet per second. The problem then is to determine the speed of the water. However, the velocity at any point is affected by the shape of the cross-section, the roughness of the surface, and to determine those is somewhat a matter of judgment of what factors to select and it requires some computations, using formulas such as the Kutter's formula to determine what factor to use. Using all those factors, I determined that the velocity at that section was about four feet per second. Multi-

plying the area of 9,271 feet by the velocity, or speed of four feet per second, gives you about 36,000 cubic feet per second as the quantity of water going by that point.

"I made a study of the storm preceding the flood at Wibaux—the storm here as described, throughout the Beaver Creek valley. The considerable thing in studying that storm was this: It was evident from the testimony that very, very heavy rains occurred on every portion of the upper part of that valley on all the different tributaries; that something had happened that hadn't happened probably before, since men came into this country; that unusual storms occurred on that creek near enough at the same time, so that the results of the rains and run off reached the spot where Wibaux is at about the same time. I have never observed at any place on any drainage basins in eastern Montana any evidence of a run off compared to this. In studying the question, I considered the best source of information for comparison is an examination of records of the Geological Survey, and in that study I did refer to the records in the vicinity as prepared by the Geological Survey; it is published by the United States Geological Survey. Every year they publish a volume for each drainage basin, which is about the size of the one I hold in my hand, and they number and date them; this one is for the Missouri River basin; and wherever there is a stream in that basin, they have a gauging point, they have a record and they give that record. That record is gained by gauging the stream at different heights—different stages, through the year, and establishing a gauge so that by reading that gauge twice a day, they can refer to a Rating Table and determine the quantity of water in cubic feet per second, going by where the gauge is, every day. That is what the records are composed of. Looking over this record for 1929, the nearest gauging station to Wibaux is about 30 miles away, on the Little Missouri River at Medora; and they have had a record of the flow of the Little Missouri River at Medora since 1903. In recording the run off or discharge of the stream at any gauging station they give the drainage basin above. The area above Medora in the Little Missouri is 6,190 square miles. They also give the maximum discharge during the year,

and also give the maximum discharge that occurred in that whole period of record. It has been agreed that the drainage area of the Beaver Creek is 342 square miles. The record gives the maximum discharge for the entire period. (I am reading from page 136, Geological Survey Water Supply Paper 686.) The maximum discharge at Medora from the Little Missouri River occurred June 7, 1929, and the amount of discharge was 38,700 cubic feet per second. In Beaver Creek we had a drainage area of 342 square miles, and in the Little Missouri we had a drainage area of 6,000 square miles, odd, and I compute the amount of water in the Beaver Creek valley as probably 36,000 cubic feet per second, and off of this 6,000 square miles in the Little Missouri drainage area, the maximum was 38,700; in other words, in a drainage area of about 30 times as much, the discharge was only a couple of thousand greater that day. I studied the flow of all of the streams given in the Little Missouri River Basin, and there is not one stream where the run off per square mile is anywhere near that which occurred at Wibaux on June 7, 1929. That discharge on June 7 was about twice what the mean flow of the Yellowstone River at Glendive was in the entire year of 1929; it was about 142% of the main flow of the Missouri River at Bismarck in the year 1929. The greatest flood almost that this country ever had was the flood in the Miami Valley in Ohio, in March, 1913. They have made reports and more history out of that perhaps, than any other flood in America; there were 400 lives lost and over $100,000,000 property loss, and the run off from the tributaries in that territory at that time of an area anywhere near the same size as Beaver Creek was only about 80 cubic feet per second; that is only 8/10ths as much as the run off at Beaver Creek at Wibaux on June 7, 1929. Using all that information, and drawing a conclusion from it, I don't hesitate to say that, in my opinion, it was an unprecedented flood—nothing like it that I have found, anywhere in the country. I would say, a flood that could not have been foreseen or expected, and could not have been planned for in building a railroad across the valley 50 years ago. If the railroad bridge had spanned the entire valley there for a quarter of a mile, it would have had

very little, if any, influence on the points covered by the flood in Wibaux.''

On the question of the adequacy of the bridge, William L. Darling gave his testimony by deposition. It appears from the record that he was an engineer of the defendant at the time the original bridge was constructed, supervised its construction, and that he approved the plans for each subsequent change in the bridge at that point, finally resigning as defendant's chief engineer in 1916. He was asked the following questions:

''Q. Can you form an opinion as to whether or not the bridge, consisting of a seventy-foot span over the creek and two 20-foot approach slope spans, provided a proper and adequate opening for Beaver Creek? A. Yes.

''Q. What is your opinion. A. It was adequate.

''Q. Give your reasons for your answer to Question No. 14. A. The waterway was designed from known high water. No higher water ever occurred while I was with the road and further from the fact that it did take the full flow until 1929, a period of 33 years, and then failed only during a period of precipitation that could not have been foreseen. Furthermore it covers a period from 1882 to 1929 of known high water, or 47 Years.''

Engineers Blum, Murray and Clements confirm the opinion of Darling that the bridge was adequate, and give reasons substantially the same as those given by Darling. Clements testified that the bridge at Wibaux in 1929 would carry 22 per cent. more water than any previous bridge there.

We have carefully examined the map got out by the engineers of the United States Army from their Kansas City, Missouri, office, Defendant's Exhibit Y-2, and have also carefully read and considered the reports of such engineers which are entitled ''Little Missouri River Flood Protection Plan,'' as it relates to Wibaux. The report is Defendant's Exhibit Y-3. The map is dated December, 1931, approximately two and a half years after the flood of June, 1929. The report outlines an extensive plan for flood control at Wibaux. The significant thing about this report and the recommendations contained therein is that it was

submitted and recommended subsequent to the construction at Wibaux of a 270-foot bridge, that the defendant, taking warning from the flood of 1929, erected at that point, and, notwithstanding the enlarged capacity of the defendant's railway bridge, the Army engineers further recommend extended improvements to protect the town from flood waters.

We think that the numerous contentions of counsel for both parties not specifically mentioned in this opinion have been fully covered by what has already been said, and further consideration of such contentions is unnecessary.

The judgments are affirmed.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, did not hear the arguments and takes no part in the foregoing decision.

Rehearing denied March 7, 1936.