No. 84-322

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

---

BILL BRITTON,

        Cross-Claimant, Respondent
        and Cross-Appellant,

-vs-

FARMERS INSURANCE GROUP
(TRUCK INSURANCE EXCHANGE),

        Cross-Defendant, Appellant
        and Cross-Respondent.

---

APPEAL FROM: District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable R.D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Murphy, Robinson, Heckathorn & Phillips; Dana L.
        Christensen and Donald R. Murray argued, Kalispell,
        Montana

    For Respondent:

        Milodragovich, Dale & Dye; Lon J. Dale argued,
        Missoula, Montana
        F. Lloyd Ingraham, Ronan, Montana

---

        Submitted: October 1, 1985

        Decided: April 17, 1986

Filed: APR 17 1986

_Ethel M. Harrison_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

We determine principally in this case that an insurer must meet the standard of a lawful basis for refusal to decline payment of an insured's claim for an insured's loss; and that reliance by the insurer on inadmissible evidence of arson by the insured in declining payment of an insured's loss does not meet the standard of a lawful basis for refusal of the insured's claim.

Farmers Insurance Group (FIG) appeals a judgment granting Bill E. Britton compensatory damages of $214,748.54 and punitive damages of $400,000.00, following a jury verdict rendered in the District Court, Fourth Judicial District, Lake County.

Bill E. Britton cross-appeals from a judgment of the District Court denying him attorney's fees and costs under section 30-14-133, MCA.

It is well to have a backdrop of applicable law before we view the facts in this case.

The justifiable expectations of parties to an insurance contract must include a broad freedom in the insurer to evaluate claims under the policy and to reject nonmeritorious claims. That freedom would be imperiled if the law imposed so high a duty of performance on the insurer that a reasonable rejection of a claim would invite a "bad faith" judgment against the insurer. The law must leave open to insurers the use of reasonableness in investigating, negotiating and paying claims. Chavers v. National Security Fire & Casualty Co. (Ala. 1981), 405 So.2d 1.

However, an insurer has corresponding duties to its policyholder. The insurer must use due diligence in reviewing and determining meritorious claims, and must pay such claims promptly. Those duties are not implied. They are expressly bargained for in the insurance contract. A breach of any of those express duties opens the insurer to a judgment for contract damages. If the misdeed of the insurer in breach of the contract is also a violation of public policy, or a breach of the implied duty of good faith and fair dealing, the injured party has a tort action against the insurer for "bad faith," notwithstanding that the act complained of may also be a breach of contract. Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 643 P.2d 198; First Security Bank v. Goddard (1979), 181 Mont. 407, 598 P.2d 1040; State ex rel. Larson v. District Court (1967), 149 Mont. 131, 423 P.2d 598.

One aspect of public policy in this case is the duty of insurers under the "valued policy" or "stated value" statute, section 33-24-102, MCA. No stranger to American statutory law, our valued policy statute provides in the absence of criminal fault or fraud that when insured improvements on real property are considered to be a total loss, the amount of applicable insurance coverage written in the policy contract is taken conclusively to be the true amount of the loss and measure of damages. The provisions of our valued policy statute, section 33-24-102, MCA, are a part of every policy of fire insurance issued in Montana. Goddard, supra; McIntosh v. Hartford Fire Ins. Co. (1938), 106 Mont. 434, 78 P.2d 82; Caldwell v. Washington Fidelity National Ins. Co. (1933), 94 Mont. 431, 23 P.2d 257.

We have few cases construing the effect of the valued policy statute, but it is clear from the jurisdictions

considering like statutes, and acceptable to us, that such a statute determines automatically and conclusively the amount of loss recoverable for total loss, Grandview Inland Fruit Co. v. Hartford Fire Ins. Co. (Wash. 1937), 66 P.2d 827 and may obviate even the necessity of a proof of loss. Commercial Union Ins. Co. v. Stanmike Investment Co. (Tex. C.A. 1971), 475 S.W.2d 295. Further, an insurer may not create a question of total loss simply to compromise its duty to pay the full amount or to negotiate a lesser amount. Grandview Inland Fruit Co., supra. Any agreement for a lesser settlement of total loss other than the amount of applicable coverage is void ab initio as against public policy. Coddington v. Safeguard Ins. Co. of N.Y. (Ark. 1963), 373 S.W.2d 413.

The statutory duty to pay the full amount of applicable coverage in valued policies applies as well to a mortgagee under a loss payable clause to the extent of the mortgagee's lien. Section 33-24-102, MCA, makes the amount of insurance conclusive as to the true value of the insured property. It does not attempt to fix the interests of the persons entitled to benefits under the policy. A loss payable clause makes the mortgagee the appointee of the mortgagor to receive the insurance money. Malvaney v. Yager (1936), 101 Mont. 331, 338, 54 P.2d 135, 138.

When, therefore, an insurer faces a claim under its issued policy for damages to an improvement on real property in Montana, the freedom of the insurer to evaluate the claim and to determine its merit does not include the amount payable if the cost of the damages to the improvement insured exceeds the predamaged value of the improvement. In that event the loss is total, and as to the amount of loss the valued policy law applies. The insurer retains the freedom,

however, to determine if the loss has merit as a claim, again, on a reasonable basis.

We determine as a matter of law in this case, under the facts, the insurer did not comply with the valued policy statute, section 33-24-102, MCA, particularly with regard to the mortgagee Bank which was entitled to payment regardless of any claim of arson against the insured Britton. As to the insured Britton, the failure of the insurer to comply with section 33-24-102, MCA would be unimportant if in fact Britton had committed arson to cause the loss for then he would not be entitled to coverage in any event.

The examination of rights of the parties on appeal therefore has three facets of applicable law as far as Britton is concerned:

(1) If Britton committed arson, he is not entitled to coverage and his judgment is a nullity;

(2) If the insurer reasonably suspected that Britton committed arson, it could decline to pay his claim without incurring a judgment for "bad faith," though a court or jury might later determine that the arson by the insured was not proved;

(3) If the insurer unreasonably declined to pay his claim, and failed to prove Britton's arson, it is subject to "bad faith" charges if it also violated public policy or breached the implied duty of good faith and fair dealing in so doing.

It is notable that each facet presents issues of fact, the determination of which by a properly instructed jury forecloses us from determining contrariwise, unless the jury erred as a matter of law. In other words, questions of fact come within the sole province of the jury and the jury verdict prevails. Gee v. Egbert (Mont. 1984), 679 P.2d 1194,

- 5 -

41 St.Rep. 515; Barry v. City of Butte (1943), 115 Mont. 224, 142 P.2d 571.

The issues raised by FIG on appeal do not include the sufficiency of the evidence to justify the jury verdict. Rather, FIG raises issues which pertain to its principal argument, that as a matter of law it did not unreasonably decline payment of Britton's claim. We will discuss those issues and the applicable facts first, and reserve for later discussion in this opinion the other issues and other applicable facts.

I.

DID FIG VIOLATE ITS DUTY OF GOOD FAITH IN DENYING PAYMENT OF BRITTON'S CLAIM?

On this subject FIG claims that it was entitled to a directed verdict from the District Court on the question of bad faith and Britton's claim for extra-contractual damages; that the District Court erred in refusing to permit FIG to introduce evidence of information which FIG had obtained and relied on in reaching its decision to deny Britton's claim; that the District Court erred in instructing the jury on portions of section 33-18-201, MCA, which had no basis in the evidence; and, that the District Court erred in admitting the testimony of Arthur M. Clark, M.D.

Bill E. Britton, a rancher, horse breeder and trainer, owned a ranch in Lake County, near Ronan, on which he had constructed a large horse arena. Britton purchased the Ronan ranch in 1974. Before that time, since 1970, he had a serious heart condition which had required open-heart surgery and had caused him uninsured medical expenses. In 1976, his heart condition again forced surgery and limited his ability to train horses personally. He decided to sell the Ronan

- 6 -

property and listed it with a local realtor in Polson. In August 1981, the realtor received an offer from a California resident for the purchase of the Britton property. The price and terms were agreed on with the exception that the buyer wanted at the same time to lease the property and continue to reside in California. In September 1981, the realtor and Britton were actively seeking a lessee for the Britton property in order to complete the sale.

The Britton property was subject to a mortgage to the Ronan State Bank. Britton provided a quit claim deed to the bank so that his affairs could be in order in the event a sale occurred while he was hospitalized in Spokane, Washington.

In the summer of 1981, FIG's agent, Mike Lanktree solicited Britton's insurance business. Lanktree inspected the property and he estimated the market value of the horse arena at $144,500.00. FIG issued its policy of fire insurance effective August 18, 1981, which included coverage for the horse arena at 80% of its market value. Accordingly, FIG's policy provided $116,000.00 in stated value coverage. Other real and personal property was insured for separate amounts.

In late September 1981, Britton prepared the arena for his stud horse, which was to be kept in the arena while Britton was absent due to a prospective hospitalization in Spokane. Britton's friend, Ethel McCready, was to care for the stud horse and to make it easy for her, straw and hay had been placed adjacent to the stalls in the arena.

Prior to September 1981, a series of vandalisms had occurred to the arena and property had been stolen. Britton wanted to make sure that the arena was secure. On September

21, 1981, he placed an additional hasp lock on a door that had only a knob key lock. All other doors, including an internal tack room door were secured with inside locking devices such as padlocks and hook-eyes. Britton left the arena secure at about 6:00 p.m. on September 21 and returned to his house located a considerable distance from the arena.

Britton went to bed early on September 21 after checking the arena. At approximately 12:30, his friend Ethel McCready arrived and found Britton in bed. At 1:00 a.m. Britton went to the bathroom to take medication. While up he observed a vehicle containing several individuals in the driveway of his home. He turned the porch light of his home on and off several times and the vehicle was driven away. He returned to bed. At approximately 3:00 a.m., he and McCready were awakened by a loud knocking on the front door. Howard Morigeau, a passing motorist, was at the door and told Britton that his arena was on fire. Britton attempted to call the fire department and then drove his pickup to the arena, arriving just shortly after the first fire truck had come to the scene. Britton claimed he had a heart failure at the fire, was given oxygen by the firefighters and went to the Ronan Hospital. Because he did not want to receive medication or treatment of any extensive nature from the hospital in Ronan, he stayed at the hospital until the next morning when he was driven to Spokane for treatment.

Although five saddles were in the arena on the day of the fire, three were found to be missing after the fire. The remains of the other two saddles were found in the tack room. The investigation after the fire by the Lake County Sheriff's Office discloses that the tack room door had been forced open.

Britton does not dispute that the fire and damage to the horse arena were the result of someone's arson. Investigation by the State Crime Laboratory identified the presence of an accelerant to the fire by a substance similar to kerosene. Britton's investigator revealed evidence of a forcible entry other than by firemen to an external door as well as to the internal tack room door from which the saddles were missing after the fire. Britton filed a theft report concerning the saddles with the Lake County Sheriff's Office.

Following the fire to the horse arena, the State Fire Marshall conducted an investigation, which included a polygraph examination of Britton. At the suggestion of officers of the Bank, Britton retained Lloyd Ingraham as an attorney to represent him in connection with the fire loss. Britton submitted a proof of loss to the insurance company on November 24, 1981. FIG's policy relating to when the loss was payable provided that the loss "shall be payable 60 days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by the filing of this company of an award as herein provided." On January 20, 1982, Britton received from an attorney representing FIG a letter in which the attorney informed Britton that the amount of the loss had not yet been ascertained and that the circumstances of the fire were still under investigation. "Farmers is not yet ready to make a final determination as to either coverage or amount." (Emphasis added.) Pursuant to the letter Britton submitted to a sworn statement taken by FIG on January 25, 1982.

On February 19, 1982, FIG took the position that Russell Britton, a son of the insured, was an insured under the

- 9 -

policy and that FIG was entitled to take his sworn statement also. That position was reiterated on April 20, 1982, in a letter from FIG's attorney to Mr. Ingraham in which the attorney stated "we are rejecting Mr. Britton's claim until we have had an opportunity to take the sworn statement of his son, Russell Britton."

The insurance policy issued by FIG to Britton is a "Package of Protection" containing several coverages, divided into sections. Section 1 of the policy is devoted to hazard insurance for farm buildings, including the horse arena, and other improvements on real property, and scheduled and unscheduled personal property. There is no definition of "insured" in the policy pertaining to Section 1. The named insured, of course, is Bill E. Britton. Section 2 of the policy provides liability and medical coverages for automobiles and like vehicles. Section 2 contains a definition of "insured" which would include the named insured, his relatives while residents of his household, pertaining to the use of insured vehicles. The question of FIG's insistence that Britton's son was an insured, under Section 1 of the policy and that the insurer was entitled to take the examination of the son was scotched by the District Court in its charge to the jury:

> Some of the evidence in this case mentions Russell Britton in connection with being an insured, and I am telling you now that the court has ruled as a matter of law that Russell Britton is not an insured under Mr. Britton's insurance contract.

The contractual provisions of FIG's policy with respect to requirements in case of fire loss, provided only that the insured must submit to examination under oath as often as reasonably required. Under Section 1 of the policy Bill E. Britton was the only insured.

- 10 -

FIG's policy issued to Britton also contained a mortgagee clause which made the first proceeds of a loss payable to Ronan State Bank as the mortgagee. The mortgagee clause included a provision that "this insurance, as to the interest of the mortgagee only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the described property . . .."

FIG's files on this loss contained shortly after the fire three estimates of damage repair, one obtained by Britton. One of those estimates was for $75,000, if the remaining parts of the burned building were used in repair. Various interoffice memos between employees of FIG indicated the belief of the writers that the loss was total.

One of FIG's interoffice memos dated February 12, 1982, said to let the attorney for FIG know that the Pocatello Branch claims office had received $75,000 authority to pay the mortgagee. "Not to pay, but to start talking pay." This authority was extended to FIG's attorney on February 16, 1982.

On March 25, 1982, FIG paid Ronan State Bank the sum of $75,000 under the mortgagee clause on the condition demanded by FIG that Ronan State Bank deliver to FIG a partial assignment of Britton's mortgage to the Bank and a full release from the Bank of its claim against the insurer.

Under the "general conditions" applicable to Section 1 in FIG's policy, Section 13 relates to the loss payable clause. It states "Loss, if any, shall be adjusted <u>with</u> <u>the</u> <u>named</u> <u>insured</u> and shall be payable to him unless other payee is specifically named hereunder." (Emphasis added.) FIG did not adjust the payment to the Bank with Britton, the named insured.

FIG claims under the subrogation paragraphs of the policy a right to receive from the Bank a partial assignment of Britton's mortgage, and to stand in the shoes of the Bank with respect to that partial assignment. The insurance policy provides:

> . . . If this Company shall claim that no liability existed as to the mortgagor or owner, it shall, to the extent of payment of loss to the mortgagee, be subrogated to all the mortgagee's rights of recovery, but without impairing mortgagee's right to sue; . . ."

At the time of the payment to Ronan State Bank, FIG did not claim either to the Bank or to Britton that no liability existed as to Britton. It had not yet acted with respect to Britton's proof of loss.

Ronan State Bank commenced an action to foreclose its mortgage from Britton by filing its complaint on May 10, 1982. Donald E. Olsson, the president of the Bank, explained why:

> Yes. The reason that we instituted a foreclosure action, the--we had an obligation at the time of the fire of approximately--this is a matter of recollection--a hundred thirty-five thousand dollars, I think it is. The--after we received the settlement for the seventy-five thousand dollars, or a payment in that amount, we gave the insurance company, at their insistence--and these were documents that they prepared, the assignment--an assignment of our mortgage and obligation in that amount. So now we were sitting with less money owing to the Bank in that sum. There's a contract to Mary Schroer that Mr. Britton had. That was a lady he's buying the property from. We had an unpaid balance on our mortgage, and the insurance company had an assignment in the amount of seventy-five thousand dollars.
>
> And so the total obligation, the total lien or mortgages against the property, had not been decreased; they in fact were going up, because of the interest accruing on the Schroer contract and on our mortgage and on the interest the insurance company had an assignment of. . .. So the only way we could clear the title, clear the air, we felt, was to institute a foreclosure action on the mortgage to bring in the insurance company, to bring in Mr. Britton, so we could get the matter

resolved and disposed of. Because, as it was, there was no way a purchaser, willing purchaser, would buy the property subject to the outstanding interests that were there and that were not resolved. This was the reason that we did institute that action. (Emphasis added.)

On July 19, 1982, Britton appeared in the foreclosure action, and cross-claimed against FIG for the full amount of the coverage provided by FIG's policy, and for further compensatory damages and punitive damages by reason of "bad faith."

FIG responded to the foreclosure action on August 10, 1982, setting up as a cross-claim against Britton its right under its partial assignment of the mortgage and requesting foreclosure of the same as against Britton. It further defended against Britton's cross-claim by alleging, for the first time, that Britton had intentionally caused the fire, had been guilty of fraud with respect to his interest in the property insured, and that he had not submitted a proper proof of loss.

Prior to the filing of its answer to Britton's cross claim, FIG had never rejected Britton's proof of loss, nor informed him in writing or otherwise that FIG contended that Britton had intentionally burned the horse arena. Instead, on July 15, 1982, FIG had written to Britton, advising him that it was cancelling and terminating his coverage under his policy, giving as a reason that "we believe that the fire loss to your insured property September 22, 1981 was a result of a fire of an incendiary nature set by a person or persons unknown having access to your insured property." (Emphasis added.)

We have set out the foregoing facts, as we must, in a light favorable to Britton since the jury agreed with his

contentions of fact. Anaconda Company v. Whittaker (1980), 188 Mont. 66, 610 P.2d 1177. However, FIG, in the trial of the cause, was able to put before the jury the following information that FIG contended proved that Britton had set the fire:

FIG's agent, Lanktree, came to the fire scene at 10:00 a.m. of the day of the fire. After surveying the damages he called adjustor David Drynan, of Missoula who also immediately came. Drynan concluded that the fire was "suspicious," and that there were "multiple sets."

The case was referred to the regional office of investigation division of FIG for the purpose of further investigation.

The division retained Richard Kirsh as investigator. He arrived on site on September 24, and identified five different points of origin and possibly as many as eight. He testified that it was a well planned fire, that the minimum amount of accelerant was 10 gallons of fuel and that whoever set the fire was familiar with the premises.

A further FIG investigator, Mike Russell, arrived on October 6, 1981 to review and photograph the scene, interview Britton and other individuals. He found from a review of a Lake County records, documents which would adversely affect Britton's financial condition. Russell in his report of October 11, 1981 which he wrote to the company identified "undeveloped leads" which included contact with previous insurance companies to gather information concerning the two previous fires, contacts with the Montana State Fire Marshall's office to acquire the results of a polygraph examination administered to Britton, and a recommended

interview with Britton's son, Russell, who was believed to possess substantial knowledge regarding the fire.

Without any reference to transcript pages nor to dates, FIG's brief on appeal states:

> Farmers followed up on the recommendations of investigator Russell, and as a result of all the efforts made by the representatives of Farmers, it was determined that the insured, Britton, was intentionally responsible for the setting of the fire which damaged his arena. Accordingly Farmers denied Britton's claim.

From the record, it clearly appears that whatever was concluded from the investigation of Russell, including any decision to deny Britton's claim, was never communicated either to Britton or to his lawyer before the foreclosure action was instituted.

The further following facts however did go before the jury in the cause:

The fire had been fueled by ingredients on the premises, straw and a liquid petroleum-based accelerant. After the fire the smell of diesel was reported to be "heavy." Firemen arriving at the scene had difficulty knocking and keeping the fire down. Britton acknowledged the fire was incendiary. The fire had been set by someone familiar with the premises because of the placing of the "sets." Approximately one week before the fire Britton purchased 50 to 55 gallons of diesel fuel although Britton's only use for diesel fuel was to heat his house. The purchase was made in September. Britton had no money to spare for fuel. His heating fuel was usually delivered by truck but this time the pickup of the fuel was made in a little used container tank by Britton. The straw had been delivered and placed in the arena the day before the fire at locations pointed out by Britton.

In addition, Britton had sole means of access to the arena, and was alone on the premises the entire day after his son and girl friend departed on the morning before the fire. He knew that his son Rusty was leaving and would not return. Ethel McCready would not return to the home premises until 2:30 or 3:00 a.m. after she closed her duties at a bar that evening. He had gone to the arena at least two times during the day preceding the fire in his pickup. He was up and out of his bedroom at 1:30 to 1:45 a.m.

The arena was locked upon the arrival of firemen. The doors had been locked and secured by Britton on the day preceding the fire. Britton had the only keys to the arena. All doors were locked when the firemen first appeared, and they were required to forcibly break into every door.

Britton had removed valuable personal property from the premises, taking all of the saddles, tack, halters, bridles and blankets out of the tack room and placing them on the floor of the milk house which could not be locked, and covered them with horse blankets. After the fire the remains of only two saddles were found in the arena: three other saddles were reported stolen.

Britton was under financial pressure at the time of the fire because of his debts: $132,000 owing to the Ronan State Bank, secured by all of Britton's property including the horse arena; $40,000 owing to Mary Schroer on the contract for deed for the purchase of the property when the fire occurred; $8,800 owing to Sally Lucas on a judgment obtained by her one month before the fire and miscellaneous other debts of approximately $6,000, making a total of $186,800.

Britton had no income since 1975, was under pressure from the Bank and Lucas to satisfy the obligations owed to

- 16 -

them, had not reduced his debt to the Bank since April 1979, had to borrow additional amounts from the Ronan State Bank in order to make the payment on the Schroer contact, had deeded his property by quit claim deed to the Ronan State Bank, and had given Ronan State Bank an assignment of his buyer's interest in the Mary Schroer contract. The arena was totally unproductive, was not being used for any purpose, and had been for sale since mid 1978.

Britton had purchased his Farmers Insurance policy one month before the fire on August 18, 1981. Other suspects were eliminated by authorities.

FIG's brief contends that the Office of the State Fire Marshall was of the opinion that Britton caused the fire and communicated this opinion to Farmers. However FIG's reference to transcript does not bear out this statement. The testimony of Deputy State Fire Marshall Churchwell was to the effect that the Fire Marshall's office had two suspects, Bill Britton and his son, Rusty. They had eliminated Rusty as a suspect. They had determined that Britton had the opportunity to set the fire and had a motive because of financial pressure. On cross examination of Churchwell, he was unable to establish financial gain for Britton from the proceeds of the insurance policy. Churchwell had estimated the cost of repair to the fire damage to be $135,000, and since the insurance proceeds would constitute $116,000, there was a loss to Britton under Churchwell's estimate, of $19,000 from the fire.

With all those facts before it, the jury decided 11 to 1 that Bill E. Britton did not intentionally set fire to the horse arena; unanimously that his arena was wholly destroyed as defined in the instructions; that his damages for the

breach of the insurance contract amounted to $116,000, 11 to 1; and unanimously that FIG had breached the implied-in-law covenant of good faith and fair dealing in its conduct of the claim. We should note that in an earlier trial in the same cause, the jury had deadlocked on the question whether Britton had started the fire and a mistrial had been declared. We are bound, however, on this appeal by the findings of the second jury.

The testimony at the trial relating to the value of the damaged property reflects that Garold Jette testified a replacement value of the horse arena to be $182,600. The Bank witness of the Ronan State Bank testified that the total value of the Britton property including the other improvements in the land was $260,000, on which the Bank had loaned as of the date of the fire a total of $131,000 (rounded). FIG's agent, Mike Lanktree, testified that the replacement value of the horse arena was $144,500. The Deputy State Fire Marshall testified the damage to the property amounted to $135,000.

Witnesses for FIG testified that as agents for FIG they had obtained estimates for the repair of the fire damage. One estimate was for $25,000, one for $75,000 and one for approximately $98,000. Mike Crouch testified for the company that the settlement with the Ronan State Bank was based on the $75,000 estimate of repair. None of the persons making the repair estimates was presented at trial to substantiate their respective estimates of fire damage. FIG presented no witnesses to testify as to the value of the fire damage.

With the testimony before it, the jury finding that the damages from the breach of the contract amounted to $116,000 is unshakable by us. Moreover, neither the jury nor we have

any basis in the record to determine whether FIG was justified in relying on lesser estimates of the cost of repair of the fire damage than the stated value in the policy because no witnesses testified to justify the lesser estimates.

A. Did the Trial Court Improperly Exclude Evidence Favoring FIG?

FIG contends that in addition to the above circumstantial evidence that Britton set the fire, it should also have been allowed to show (1) evidence of polygraph examinations which Britton failed and two other suspects successfully passed; and (2) evidence that Britton had a history of three other fires and subsequent recovery of insurance proceeds from those fires.

Taking the polygraph issue first, it appears that Mike Stotts, employed by the State Fire Marshall's office, after the fire of September 22, 1981, conducted three polygraph tests of Britton. Britton submitted a motion in limine to exclude the polygraph results. A hearing was held on the motion on April 13, 1983, before the first trial and before District Judge John S. Henson who was then in jurisdiction in the cause.

At the hearing, Britton called David Lykken, Ph.D., and qualified him as an expert on polygraph interrogation. Lykken testified that the polygraph results have "zero probative value," and that allowing polygraph evidence in the courtroom would be on a par to allowing testimony of astrologers and fortune tellers.

At the hearing, Mike Stotts was present in the courtroom. FIG's counsel did not call him in connection with an offer of proof on the polygraph results, but counsel for

Britton interrogated Stotts, and developed from him that he had performed the polygraph examinations without determining the effect of the various medications which Stotts knew that Britton had been taking. Stotts wrote after the polygraph examination to one Robert Hensor, at the Backster School of Lie Detection, in San Diego, California, requesting information as to whether Britton's heart problem and medication could be the reasons that Britton appeared to be deceptive. Hensor answered in writing that he could not answer the question as to medication though he regarded the polygraph results as deceptive.

FIG failed to make a record as to the details of the polygraph examinations of Russell Britton and Sally Lucas, the results of which FIG now claims should have been admitted to evidence.

Judge Henson granted the motion in limine and excluded the polygraph test of Britton, relying on State v. Beachman (Mont. 1980), 616 P.2d 337, 37 St.Rep. 1558; Gropp v. Lotton (1972), 160 Mont. 415, 503 P.2d 661, as determining that in Montana polygraph results are inadmissible in civil and criminal trials. (After Judge Henson's order in 1983, section 37-62-302, MCA, became effective, which provides that results of a polygraph examination may not be introduced or admitted in a court of law.)

On May 19, 1983, Britton moved for an order in limine to exclude all reference in the trial to prior fires occurring to Britton's properties on which he may have received insurance proceeds. In ruling on the motion, the District Court had before it the testimony of Britton at a hearing held on May 19, 1983, and the deposition of Sally H. Lucas taken on September 24, 1982.

Britton testified that he had disclosed on the morning of the fire to FIG's investigator information about other fire losses during the course of his life. One involved the fire loss of a Trail Boss, which is a combination mobile home and two-horse trailer. Britton testified that the Trail Boss had caught fire as he was pulling it down the road with his pickup. It was worth $16,000 on a proposed sale, and there was a $7,000 loan to the Ronan State Bank. The insurance coverage was $11,000. The trailer fire occurred in April 1979.

In 1967, he had a fire loss involving a farm home at Ovando, Montana. He received a check for $10,000 covering mortgage insurance which he used to buy a trailer house in place of the home at Ovando. He was not present when the fire occurred but was in Billings, Montana. The home was destroyed because of a chimney fire.

A third fire involved property in Hamilton, Montana, which was in the possession of his former wife after divorce. His name was on the insurance policy and when the fire loss occurred, he simply signed the insurance proceeds to the mortgage holder on the wife's property. He was not present when the fire occurred.

The deposition of Sally Lucas is unworthy of consideration. It is unintelligable regarding the prior fires, and is replete with irrelevancies and hearsay upon hearsay.

Judge Henson granted the motion in limine to exclude reference to the prior fires at the commencement of the first trial on May 23, 1983. During the course of the second trial, before District Judge R. D. McPhillips, FIG made an offer of proof. It sought to elicit from Adam Kirsch

testimony to the effect that he had loaned to Britton $7,106 in 1977 and that it was repaid on April 9, 1979; that in connection with making the loan in 1977, the Bank took a security interest on a Trail Boss which was on the market for $16,000. It was insured and a loan was made for one year. In March 1979, a fire occurred to the horse trailer, the insurance proceeds were received and two weeks later the loan was made to the Ronan State Bank. The basis of the offer of proof was that it showed evidence of a common scheme or motive. Judge McPhillips denied the offer of proof, stating that Judge Henson had already ruled in the matter.

Taking the matter of the refusal of the polygraph results first, it is clear that the District Court was correct in denying the polygraph evidence. Gropp v. Lotton, supra. FIG contends that because it is being sued for "bad faith" the polygraph results ought to be admissible as proof of FIG's good faith in refusing to pay the claim. FIG relies principally on Moskos v. National Ben Franklin Ins. Co. (Ill. App. 1978), 376 N.E.2d 388. In Moskos, it was held by the Third Division of the Illinois Appellate Court that whether the polygraph test results were accurate or inaccurate was irrelevant but the fact that the insurance company had knowledge of the results in denying the claim was relevant to establish that the insurer did not act in bad faith "in contending that the plaintiff committed arson."

There is, however, a later different decision in another division of the appellate level in Illinois respecting the admissibility of polygraph results within the knowledge of the insurer when denying a claim on the basis of arson. In Lynch v. Mid-American Fire & Marine Ins. Co. (Ill. App. 1981), 418 N.E.2d 421, 429, that appellate court said:

- 22 -

> . . . The trial court refused an offer of proof
> that a polygraph test was given to Boes and the
> examiner's opinion was that he showed deception
> when he denied setting the fire or knowing who did.
> The parties did not dispute that the evidence would
> have been inadmissible for purposes of showing that
> Boes was guilty of arson. There is authority for
> its admissibility if limited to proof of
> defendant's good faith in refusing to pay [citing
> Moskus.] As the evidence would likely to have been
> improperly considered by the jury as to the arson
> policy defense despite any limiting instruction the
> trial court did not err in balancing the prejudice
> against the probative value and denying admission.

We hold that the polygraph results were inadmissible in this case. Such was the declared public policy of this state in section 37-62-302, MCA when this case was tried, even though Judge Henson's ruling preceded the effective date of that declared public policy. The District Court properly followed the decided law of Montana in Gropp v. Lotton (1972), 160 Mont. 415, 503 P.2d 661 in denying evidence of the polygraph results.

In like manner, we find no error in the denial by the District Court of evidence or testimony relating to prior fires on which Britton may have received insurance proceeds. In the usual case, questions of admissibility of evidence are left largely to the sound discretion of the trial court, subject to review only in case of manifest abuse. Cech v. State (1979), 184 Mont. 522, 604 P.2d 97. The proffered evidence did not meet the test of relevancy, in that it did not make probable that Britton had committed arson either from the viewpoint of motive, intent or the deed itself. Rhodes v. Weigand (1965), 145 Mont. 542, 402 P.2d 588. Unless evidence naturally and logically tends to establish a fact in issue, it is not admissible, Brion v. Brown (1959), 135 Mont. 356, 340 P.2d 539. See McConnell-Cherewick v. Cherewick (Mont. 1983), 666 P.2d 742, 40 St.Rep. 1102.

B.    Reliance on Inadmissible Evidence to Deny Fire Claim.

We come now to consider whether FIG was entitled to rely on the inadmissible evidence foregoing to decline payment of the insurance proceeds and so escape the charge that it had not acted in good faith.

The jury in this case has decided that on the circumstantial evidence presented to it by FIG, and the other evidence on the cause, FIG did indeed breach its duty of good faith.    We hold that FIG was not entitled to rely on inadmissible evidence to deny payment of Britton's claim.

It is not within the bounds of the duty of good faith between an insurer and the insured for the insurer to rely on rumor, hearsay, polygraph results or other inadmissible evidence to deny a loss under a fire insurance policy and so force the insured to court action to collect the proceeds of his claim.    While an insurer may utilize inadmissible facts or evidence to develop admissible evidence, it does not act reasonably if it declines payment of an insured's claim merely upon inadmissible evidence or testimony.    Chavers v. National Security Fire & Casualty Co. (Ala. 1981), 405 So.2d 1, 8.

C.   Did the District Court Overinstruct the Jury?

FIG's position under this issue is that the District Court erred in including in its charge to the jury a verbatim reproduction of the fourteen proscribed unfair claim settlement practices contained in the Montana Insurance Code (section 33-18-201, MCA).

FIG's claim is based on its argument that the majority of the unfair claims settlement practices enumerated in section 33-18-201 have no applicability to any issue in this case.    FIG relies on Richland County v. Anderson (1955), 129

Mont. 559, 291 P.2d 267; Bogovich v. Chicago-Milwaukee-St. Paul & Pacific Railroad Co. (1949), 122 Mont. 312, 203 P.2d 971; and Garrison v. Trowbridge (1947), 119 Mont. 505, 177 P.2d 464, among others.

There was at least an arguable basis for the submission to the jury for the determination of issues under the following unfair claims settlement practices contained in section 33-18-201, MCA: (1) misrepresenting insurance policy provisions relating to coverages at issue; (2) failing to acknowledge and act reasonably promptly upon communications with respect to claims; (3) failing to adopt and implement reasonable standards for the prompt investigation of claims; (4) refusal to pay claims without conducting a reasonable investigation based upon available information; (5) failing to affirm or deny coverage within a reasonable time after proof of loss statements have been completed; (6) neglecting in good faith to effectuate settlements in which liability had become reasonably clear; (7) compelling the insureds to institute litigation to recover the amounts due by offering substantially less than the amounts ultimately recovered; (8) attempting to settle a claim for less than the amount to which a reasonable man would be entitled to by reference to advertising material or an application; (9) making claims payments to insureds and beneficiaries not accompanied by statements setting forth the coverage under which the payments were made; (10) delaying the investigation or payment of claims by requiring an insured to submit preliminary claim reports and subsequent formal proof of loss which contains substantially the same information; (11) failure to promptly settle a claim if liability has become reasonably clear; and (12) failing to

- 25 -

promptly provide a reasonable explanation of the basis for denial of a claim.

Of the fourteen unfair settlement practices listed in section 33-18-201, MCA, only two appear to be not applicable to this case. They are: (1) attempting to settle claims on the basis of an application which is altered without notice or knowledge of the insured; and (2) making known to insureds a policy of appealing from arbitration awards to compel settlements. We determine that the inclusion of those two unfair claims settlement practices in the jury charge was harmless in this case. Such error is not prejudicial where it appears that without the erroneous instruction the same verdict would be rendered. Wolfe v. Schulz Refrigeration (1979), 188 Mont. 511, 614 P.2d 1015.

D. Should the District Court have Granted FIG's Motion for Directed Verdict?

FIG contends that the District Court erred in not granting its motion for directed verdict so as to relieve it from extra-contractual damages and for liability on its implied duty of good faith and fair dealing.

A motion for directed verdict is properly granted only in the complete absence of any evidence to warrant submission to the jury, and all inferences of fact must be considered in the light most favorable to the opposing party. Jacques v. Montana National Guard (1982), 199 Mont. 493, 649 P.2d 1319; if the evidence viewed in a light most favorable to plaintiff indicates reasonable men could differ as to the conclusions drawn from the evidence a directed verdict is not proper. Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 643 P.2d 198.

The question of Britton's arson was an affirmative defense by FIG, and of course, an issue of fact for the jury.

Arson may be proved by circumstantial evidence, and a prima facie case is shown if there is (1) arson by someone; (2) motive by the insured; and (3) unexplained surrounding circumstantial evidence implicating the insured. Lawson v. State Farm Fire and Casualty Insurance Company (Colo. App. 1978), 585 P.2d 318. Circumstantial evidence alone may be relied upon to prove the defense of incendiarism but the proofs should do more than throw a mere suspicion of guilt on the insured. The insurer may not rest upon speculation and conjecture alone. However, a preponderance of the evidence is sufficient to establish the arson. Great American Insurance Company v. K & W Log, Inc. (Wash. App. 1979), 591 P.2d 457.

Had FIG in this case relied on admissible circumstantial evidence and promptly denied the claim, we would then have been constrained to hold that Britton was not entitled to extra-contractual damages or to punitive damages in this case. There were other elements in its handling of the claim, however, that made a jury issue of whether FIG breached its duty of fair dealing in at least the following respects:

1. It created an issue of total loss to the horse arena to avoid the application of the valued policy statute.

2. It failed to pay under the loss payable mortgage clause the stated value of the loss to the mortgagee Bank.

3. It did not negotiate its payment to the mortgagee Bank with the insured as required by its policy.

4. In making payment to the mortgagee Bank, it took a partial assignment of the Bank's mortgage, which had the

- 27 -

effect of (a) not reducing the debt on the mortgage owed by Britton, (b) continuing interest charges on that portion of the debt assigned, and (c) precipitating the mortgage foreclosure action by the Bank.

5. It failed to deny coverage of the claim within a reasonable time after Britton's proof of loss statements had been completed.

6. It never raised the question of arson directly with Britton until it filed its answer and cross-claim in the foreclosure action.

7. It claimed a subrogation right under the policy without first denying the claim to its insured. (We know from the record, though it has no application here, that the Bank later contended with the insurance company that it had no right to a partial assignment under its subrogation clause. The effect of taking the partial assignment was to place the insurance company ahead of a judgment creditor in this case.)

8. It wrongfully delayed the claim from Britton upon its insistence that Russell Britton was an insured under the policy.

There were therefore sufficient elements of breach of good faith in the handling of the Britton claim for the District Court to submit the issue of extra-contractual damages and punitive damages to the jury.

The District Court in this case carefully covered the issue of good faith in its charge to the jury. The court instructed the jury that it was a breach of good faith to refuse unreasonably to pay a valid claim and such refusal would subject the insurer to liability for all damages proximately resulting from the conduct. The jury was

instructed that FIG could be incorrect in denying a claim and not be subject to liability. Its refusal had to be unwarranted, unreasonable and without justification.

The District Court in this case properly submitted the issues of extra-contractual damages and punitive damages to the jury. We find no error on this issue.

E.   Did the District Court Err in Admitting the Testimony of Dr. Clark?

FIG assigns as error the admission to evidence of the videotape deposition of Arthur M. Clark, M.D. FIG contends the deposition was cumulative, had no probative value and invoked the sympathy and passion of the jury.

Britton's counsel argued that Dr. Clark's testimony was relevant to the question of whether or not Britton was physically capable of setting the fire and also relevant for testimony concerning the condition of Britton's lungs immediately after the fire, the lack of smoke in his lungs, offered in support of Britton's contention that he did not set the fire.

Britton responds that the videotape deposition was edited by the District Court to delete the portion showing Britton's diseased and enlarged heart.

The edited version was submitted to the jury without an objection by FIG, and under a cautionary instruction from the court that the video was not to be considered for Britton's damages, but only to show whether he was physically able to participate in the fire in the way that FIG claimed he did.

The district judge in his order denying the post-trial motions of FIG found the objection to have been waived. Sections 103(a) and (a)(1), M.R.Evid. are in accord. We find no error on this point.

II.

SHOULD THE DISTRICT COURT HAVE GRANTED SEPARATE TRIALS ON THE
CONTRACT AND TORT ISSUES?

The District Court declined to bifurcate the trials so
as to determine in separate trials (1) whether Britton
intentionally caused the fire and (2) whether FIG committed a
breach of good faith.

FIG claims prejudice from the denial because of (a) the
preclusion of evidence regarding the polygraph examinations,
and the prior insurance claims for fire losses; (b) a finding
of intentional burning by the insured would preclude further
proceedings; (c) error in the order of presentation in the
evidence--FIG claiming that it was entitled to present its
evidence first because of its affirmative defenses of
intentional burning and misrepresentation; and, (d)
commingling of the evidence regarding FIG's affirmative
defenses with evidence of unfair claims settlement practices
and the wealth of FIG.

The District Court denied the motion for separate trials
upon the mistaken impression that the district judge earlier
in jurisdiction had denied bifurcation of the issues.
Several times during the trial the District Court made
off-the-cuff comments that the case should have been severed
for purposes of trial. In its order denying the post-trial
motions made by FIG, the District Court noted that the
earlier district judge had decided not to bifurcate the trial
and that "while this judge questions the wisdom of combining
the claims because of very obvious problems that arise in the
proof, it will not disturb Judge Henson's order."

Although no order by District Judge Henson can be found
in the record denying bifurcation, it is clear from the

record that all parties assumed that he had done so and it was never brought to the attention of District Judge McPhillips that District Judge Henson had in fact not so ordered a denial.

In Klaudt v. Flink (Mont. 1983), 658 P.2d 1065, 40 St.Rep. 64, we held that a third party to the insurance contract could join his cause of action against the insurer for violation of the unfair claims settlements act of our code with the underlying action against the insured individual in a liability case.

In 1985, the legislature enacted section 33-18-241, MCA, effective October 1, 1985, to the effect that the trial of a claim against an insurer for lack of good faith in its handling or settlement of a claim could not be consolidated with the trial of the underlying claim if the lack of good faith claim is against a party different from the party against whom the underlying claim is made without stipulation of counsel. Section 3, Ch. 504, Laws of Montana (1985). That statute does not apply to this case, both because of the effective date and because this case involves a first party claim.

In deciding this issue, we must keep in mind the status of the pleadings in this case. As we indicated, Ronan State Bank started a foreclosure action against Britton, FIG and others by filing its complaint for foreclosure on May 10, 1982. Britton answered the Bank's foreclosure complaint by answer on July 19, 1982 in which Britton included a cross-claim against codefendant FIG. Britton's cross-claim does not allege a cause of action in contract, but rather one in tort for violation of the unfair claims settlement practices act, section 33-18-201, MCA.

- 31 -

FIG responded to the Bank's complaint of foreclosure by filing its own cross-claim against the remaining defendants for foreclosure of its partial interest in the mortgage, and then set out ten defenses against Britton's claim in tort. The third defense alleged that Britton had failed to meet the terms and conditions of the policy for recovery; FIG's fourth defense alleged that Britton had intentionally caused the fire; FIG's fifth defense alleges willful concealment by Britton of material facts involving his interest in the insured property by fraud and by false swearing and by failure to submit a proper proof of loss within the time required by the policy; its sixth defense is one that Britton refused to submit to sworn statements and refused to produce records; the seventh defense raises estoppel, failure of consideration and fraud; its eighth defense is a claim for mitigation of Britton's damages; its ninth defense is that punitive damages are not permitted under applicable law; and its tenth defense is that Britton's claims are barred by section 50-63-405, MCA.

On April 12, 1984, FIG moved for a separate trial, stating in its motion:

> . . . [moves the Court] to order a separate trial of the defenses raised by Farmers in their answer to Plaintiff's Cross-Claim (including the defenses of failure to meet the terms and conditions of the insurance policy, intentional setting of fire, willful concealment, misrepresentation, fraud, false swearing, failure to submit a proper Proof of Loss and failure of the insured's son to properly submit to a sworn statement) and further directing that the trial of the remaining issues raised by the Plaintiff in his Cross-Claim be postponed until after final determination of the separate trial of the said issues . . ..
>
> . . .
>
> Defendant Farmers further moves that the trial of the allegations of Plaintiff's Cross-Claim, if required, follow immediately the trial on the

affirmative defenses of Farmers, and be tried before the same jury.

In a supporting brief, FIG argued for a separate trial, because its case would take a lesser amount of trial time and if decided in its favor would negate Britton's cross-claim.

Here, Britton, having a choice of two remedies, one in contract and one in tort, elected to pursue his claim in tort. Recovery by him on his claim in tort would have the effect of barring his claim for breach of contract. Massett v. Anaconda Company (Mont. 1981), 630 P.2d 736, 38 St.Rep. 961. If the District Court had granted FIG's motion for separate trials, it would have then converted Britton's claim for tort to one for breach of contract. Britton would then have been precluded from presenting any evidence as to consequential damages for the tort, let alone any evidence relating to punitive damages in the first trial. His right to a trial by jury of his tort claim, guaranteed by Art. II, § 26, 1972 Mont. Const. and the Seventh Amendment to the Federal Constitution would have been prejudiced.

Under Britton's tort claim, the issues of fact regarding FIG's violations of the Unfair Claims Settlement Act are inextricably woven with FIG's claim of intentional burning. FIG made no attempt to sustain its other affirmative defenses. As we said in State ex rel. Fitzgerald v. District Court (1985), 703 P.2d 148, 42 St.Rep. 1061:

> It is clear to us that the issue of exemplary damages in any case is so interwoven with the proof first of negligence and secondly of willfulness, wantonness, malice or oppression, that their separation under Rule 42(b), M.R.Civ.P. for decision by a single jury seriatim or by different juries is an abuse of discretion by the District Court, which would result in extended and needless litigation.

- 33 -

Moreover, FIG, having filed its motion for a separate trial while Judge McPhillips was in jurisdiction of the cause, failed to follow up on its motion to procure a written order or minute entry granting or denying separate trials. If Judge McPhillips orally denied the motion on the assumption that Judge Henson had earlier denied separate trials, it was the duty of counsel for FIG to alert the district judge as to his mistaken assumption. In those circumstances the district judge may not be put in error.

FIG filed its motion for separate trials on April 12, 1984, and 11 days later, on April 23, 1984, the case came on for trial. What happened in the interim as to the motion for separate trials is not found in the record. FIG neither procured a written order granting or denying the motion, nor caused a minute entry to be made of the disposition of the motion. The case then went to trial without bifurcation. From the nature and extent of the motion made by FIG, it is clear that if the court had granted the motion it would have been reversible error.

FIG's motion for separate trial was not directed simply to the issue of intentional burning by Britton. Rather, the motion requested that all of FIG's defenses be first tried before Britton's tort claim could be considered.

FIG's affirmative defense of "failure to meet the terms and conditions of the insurance policy" would include the following issues of fact contended for by Britton and included in the pretrial order: That the damages caused by the fire claimed by Britton were exaggerated and in excess of the amounts indicated by FIG's investigation; that the bid of John Rody for $75,000 was reasonable and would completely repair the damaged structure; and that Britton refused to

- 34 -

cooperate in identifying the location of Russell Britton. FIG's affirmative defenses of willful concealment, misrepresentation, fraud, and false swearing raised these issues of fact in the pretrial order: That Britton submitted a proof of loss for three saddles which were neither burned nor stolen at the time of the fire and were concealed for the purpose of fraud; and that his proof of loss for the three saddles was fraudulent. FIG's affirmative defense of Britton's failure to submit a proper proof of loss was intertwined as an issue of fact with Britton's claim that the failure of FIG to reject the proof of loss and to deny the claim constituted waiver and estoppel. FIG's further affirmative defense that the failure of the insured's son to properly submit to his sworn statement raised issues of both law and fact as to whether Russell Britton was an insured under the policy and whether he did in fact submit to a sworn statement.

The issues of fact and law under FIG's defenses were inextricably intertwined with the issues and contentions of Britton that the damages caused by the fire exceeded the $75,000 which FIG paid to the Bank; that Britton had submitted a proof of loss in accordance with "the stated value" law and was entitled to payment of $116,000; that the actions of FIG were unreasonable in contending that it had a right to subrogation after paying the Bank, that Russell Britton was an insured under the policy, that Britton had intentionally burned the barn, that he had willfully concealed the saddles and had claimed insurance proceeds for their loss, and that FIG had never rejected his claim after proof of loss had been submitted, causing him emotional distress.

Obviously it would have been impossible for the District Court to grant FIG a separate trial on the defenses claimed by FIG's without overlapping on issues raised by Britton in his tort claim. The policy of the law is to avoid multifariousness in litigation and to resolve all issues and lawsuits in one trial. Carlson v. Cain (Mont. 1985), 700 P.2d 607, 42 St.Rep. 695. Affirmative defenses which do not go to the merits of defendant's claim, as for example a defense of a statute of limitation or of lack of jurisdiction, may lend themselves to bifurcation, but affirmative defenses which dispute the merits of a claim on issues of fact do not. It is when plaintiff's issues of fact are interwoven and intertwined with the issues raised by the defendant that the rule we announced in State ex rel. Fitzgerald v. District Court (Mont. 1985), 703 P.2d 148, 42 St.Rep. 1061, applies; a grant of FIG's motion for separate trials of its affirmative defenses in this case would have been an abuse of discretion, and reversible by us.

Finally, as we stated earlier, all parties, including counsel for FIG, assumed that District Judge Henson had in fact entered an order denying bifurcation. This mistaken assumption continued past the time when District Judge McPhillips denied a new trial after the post-trial motions. It was not until this appeal that FIG raised the issue that District Judge Henson had not in fact so ruled. Thus Farmers is in the position of asking this Court to put District Judge McPhillips in error on a point not brought to his attention. This Court looks with disfavor on raising issues on appeal not addressed to the District Court in the underlying action. A trial court cannot be put in error, on its order denying a motion for a new trial, on matters not brought to its

attention by notice or otherwise. See Gardiner v. Eclipse Grocery Company (1925), 72 Mont. 540, 234 P. 490.

### III.

DID COUNSEL FOR BRITTON MAKE IMPROPER ARGUMENT TO THE JURY?

In closing argument, Britton's counsel stated to the jury:

> . . . And the evidence here is this: Mr. Britton has not been convicted of any criminal offense in regard to this situation . . ..

In closing argument, he said to the jury in part:

> . . . And we're not coming in here and saying that arsonists shouldn't be punished because they should, by the proper authorities--not some California insurance company.

The ground of FIG's objection to the closing arguments is that evidence of nonprosecution for arson in cases for insurance proceeds is not admissible, relying on American Home Assurance Company v. Sunshine Supermarket, Inc. (3rd Cir. 1985), 753 F.2d 321, and other cases.

The issue arose because of the provision in the stated value law, section 33-24-102, MCA, which provides that the valued policy law applies "without criminal fault on the part of the insured."

It was pertinent to Britton's case that the jury, in considering whether the valued policy law is applicable, should also know whether Britton was without criminal fault. Otherwise, under its terms, the valued policy statute would not apply.

Prior to final argument, the matter was brought up to the court as follows:

> MR. DALE: And then in terms of conviction, we just get to say Mr. Britton hasn't been convicted of any criminal offense.

> THE COURT: Yes, and that's the end of that.

FIG made no objection to this ruling. The argument made by Britton's counsel was proper in the circumstances.

IV.

DID CONSUMPTION OF ALCOHOLIC BEVERAGE BY THE JURY INFLUENCE THE OUTCOME OF THE CASE?

FIG maintains that the jury verdict here was invalid per se because of "drinking by a jury after deliberations have begun."

The record reveals that while the jury was considering this case, it was taken to dinner. Some members of the jury asked if it would be alright to have a drink. The bailiff in charge told them yes after receiving approval from her "boss." The evidence was that no juror had more than one glass of wine or beer during dinner and that no juror was observed in an impaired condition from the consumption of the one drink.

This issue is controlled by Wibaux Realty Company v. Northern Pacific Railway Company (1935), 101 Mont. 126, 54 P.2d 1175. There this Court held that unless a party litigant is culpable, the consumption of alcoholic beverage by a juror during its deliberations which is not excessive and which is not shown to have led to a miscarriage of justice is not grounds for reversal of a jury verdict.

While we caution judges and bailiffs that no persons serving on a jury during their deliberation should be allowed alcoholic beverages, particularly at county expense, we decline to adopt a per se rule invalidating jury verdicts on the record presented here. FIG has made no showing that the consumption of one glass of beer or wine by several jurors during dinner did in any way influence the outcome of the case.

CONCLUSION.

Accordingly, we affirm the judgment of the District Court in favor of the cross-claimant Bill E. Britton.

CROSS-APPEAL

Britton assigns as error in his cross appeal the refusal of the District Court to award attorney's fees and nontaxable costs to him under the Consumer Protection Act, section 30-14-133, MCA.

Following the verdict, Britton made a motion for determination by the District Court for Consumer Protection Act relief under section 30-14-133, MCA. Because consideration of Britton's motion was still pending at the time FIG filed its appeal in this Court, we reinvested District Judge McPhillips with jurisdiction to determine whether Britton was entitled to consumer protection relief. On February 27, 1985, District Judge McPhillips entered findings of fact and conclusions of law in regard to the issue. He found that the representation of Britton was "on a contingency basis," and that Britton's "attorneys had made their fee arrangement." The District Court found that a total of 2,841.02 hours were spent by plaintiff's attorneys in the prosecution of the case which the court determined was reasonable under the circumstances. The District Court further found that $75.00 an hour was a reasonable hourly rate for attorney's services in the cause. It also found that Britton's attorneys had advanced costs of $34,654.84, of which only $5,513.26 qualified as taxable costs. Judge McPhillips declined attorney's fees and further costs on the ground that the total punitive damages award of $400,000.00

was sufficient to pay Britton's attorney's fees plus the nonallowable costs.

On cross-appeal, Britton argues that the refusal of the District Court to award attorney's fees and costs under the Consumer Protection Act invades the punitive damages award which he rightfully obtained from the jury, and that under Salois v. Mutual of Omaha Insurance Company (Wash. 1978), 581 P.2d 1349, a violation of the unfair claims settlement act by an insurer entitles the aggrieved party to relief under the Consumer Protection Act. The district judge agreed that Salois applied, but denied relief for the reasons stated above.

Punitive damages may be awarded by a jury in a proper case where the defendant has been guilty of oppression, fraud or malice in addition to actual damages "for the sake of example and by way of punishing the defendant." Section 27-1-221, MCA. The function of punitive damages is just as the statute says and the office of punitive damages is not to make up for attorney's fees or noncollectable expenses to which a litigant may feel entitled. On that point, the District Court was in error in denying relief.

The District Court, however, reached the right result for the wrong reason.

Section 30-14-103, MCA, a part of the Unfair Trade Practices and Consumer Protection Act provides that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." (Emphasis added.) Under section 30-14-133, MCA, a person guilty of an unfair trade practice under section 30-14-103 is subject to actual damages incurred by the

- 40 -

aggrieved party which the court in its discretion may increase up to three times.

However, the Consumer Protection Act was meant to be interpreted and enforced in conjunction with and guided by the interpretations of the Federal Trade Commission and the federal courts relating to the Federal Trade Commission Act. See section 30-14-104, MCA. No interpretation of the Unfair Trade Practices and Consumer Protection Act can be inconsistent with the rules, regulations and decisions of the Federal Trade Commission Act. Section 30-14-104, MCA.

On the other hand, the Unfair Claims Settlement Practices Act, section 33-18-201, MCA, springs from a different source than the Federal Trade Commission Act. It is part of a response by the state to the mandate of the federal government that with respect to insurance companies engaged in interstate commerce, the state should provide effective regulation of insurance companies and their practices.

In 1944, the United States Supreme Court reversed a longstanding rule in U.S. v. South-Eastern Underwriters v. Assoc. (1944), 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, reh. denied 323 U.S. 811. It held the business of insurance was interstate commerce. The impact of that decision was to put in doubt at that time all of the powers of the individual states to regulate insurance companies and their activities, and to tax their insurance premiums.

Following the South-Eastern Underwriters' decision, Congress adopted the McCarran-Ferguson Insurance Regulation Act, 15 U.S.C. § 1011, et seq., 59 Stat. 33, enacted March 9, 1945. The McCarran-Ferguson Act provided that if states undertook to regulate the insurance business, the state

regulation would bring the insurance industry in the state within the exceptions to federal law relating to taxation, anti-trust and trade practices provided by the McCarran-Ferguson Act. See U.S. Code and Congressional Service, Vol. 2, at 670 (1945), Report of House Committee on Judiciary.

Under the influence of the McCarran-Ferguson Act the insurance commissioners of the states promoted a model code for the regulation of insurance companies. In 1959, our legislature adopted a complete recodification of the insurance code. It included a chapter on trade practices and fraud. The stated purpose of Montana in adopting the trade practices law was to regulate the business of insurance in accordance with the intent of Congress as expressed in the McCarran-Ferguson Act. Former section 40-3501, R.C.M. (1947).

The present Unfair Claims Settlement Practices Act of our code was adopted in Ch. 320, Laws of Montana (1977). The stated purpose of the act was "to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in [the McCarran-Ferguson Act] by defining or providing for determination of all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." That language is now found in section 33-18-101, MCA.

Under 15 U.S.C. § 1011, the federal anti-trust laws and the federal trade practice laws are not applicable to the business of insurance in the state to the extent that such activities of the insurance industry are regulated by state law.

It will be seen therefore that the purpose of the Unfair Trade Practices and Consumer Protection Act is to conform to the Federal Trade Commission Act. On the other hand, the purpose of the Unfair Claims Settlement Act, relating to insurance companies, is to provide effective state regulation in accordance with the McCarran-Ferguson Act, so as to be exempt from the federal regulations.

We therefore hold that the provisions of the Unfair Trade Practices and Consumer Protection Act, as relied on by Britton may not be applied with respect to insurance company practices, and Britton must be confined to such relief as may arise out of the insurance code for unfair claims settlement practices.

Accordingly, we affirm the judgment of the District Court with respect to denial of further attorney's fees and nontaxable costs. In any event, we award costs on this appeal to Britton.

John L. Sheehy
_____
Justice

We Concur:

_____

_____

_____
Justices

- 43 -

Mr. Justice Fred J. Weber separately concurs as follows:

I concur in the majority opinion with the exception that I do not agree with all of the statements regarding whether the District Court should have granted separate trials on the contract and tort issues as set forth in Part II. I do agree that separate trials are not appropriate as stated in the last paragraph of Part II.

As pointed out in the majority opinion, all of the parties, including the counsel for FIG, assumed that Judge Henson had entered an order denying bifurcation. This mistaken assumption continued past the time when Judge McPhillips denied a new trial after trial on the merits and post trial motions. It was not until this appeal that FIG raised the issue that Judge Henson in fact had not ruled against bifurcation. I agree with the majority conclusion that FIG may not put Judge McPhillips in error on a point not brought to his attention and not raised prior to the time of this appeal. I therefore join in the conclusion that it would not be proper for this court to remand for separate trials.

_____
Justice

We join in the special concurrence of Mr. Justice Fred J. Weber.

_____
Justice

_____
Robert M. Holter, District Judge, Sitting for Mr. Justice John C. Harrison

44

The Hon. Henry Loble, District Judge, dissenting:

I respectfully dissent. The trial judge did not consider and rule upon appellant Farmers Insurance Group's (FIG) motion for separate trial on that motion's merits.

The trial court was under the erroneous impression that District Judge Henson, who had previously presided in the case, had denied a cross-defense motion for separate trial. The trial judge repeatedly, during the trial, recognized that he should have severed the case. For example, he said: "THE COURT: Well, I think it's another prime example of why <u>this case should have been severed for purposes of trial</u>." (Emphasis added.) And again, he said: "THE COURT: If I were over here, <u>I'd sever this case</u>." (Emphasis added.) Further, he stated: "THE COURT: Well, this is just another prime example of why <u>these cases should be severed</u>. That old sword cuts both ways." (Emphasis added.) In his order of June 28, 1984, denying Farmers' post-trial motions, the trial judge said:

> The irregularity of not bifurcating the trial into a contract action and a separate tort action is Farmer's first point of contention.
>
> District Judge Henson in pre-trial proceedings herein ordered the contract and tort claim tried together. This Judge will not disturb Judge Henson's order. <u>Klaudt v. Flink</u>, 658 P.2d 1065, suggests the contract action and the tort may be tried together. While <u>this Judge questions the wisdom of combining the claims because of very obvious problems that arise in the proof</u>, it will not disturb Judge Henson's order. (Emphasis added.)

In the same order of June 28, 1984, the trial judge said:

> The exclusion of the evidence prejudiced the Cross-Defendant's Farmers' defense in the bad faith claim. <u>Another reason why this cause ought to have been bifurcated</u>. (Emphasis added.)

Rule 42(b), M.R.Civ.P., provides as follows:

> Separate trials. The court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.

This Court has endorsed the use of separate trials to avoid prejudice and for judicial economy. State ex rel. Northern Pacific Railway Co. v. District Court (1970), 155 Mont. 91, 467 P.2d 145; Monaco v. Cecconi (1979), 180 Mont. 111, 589 P.2d 156.

Appellant was entitled to have the trial court consider its motion for separate trial on the merits. The trial judge did not exercise his discretion at all when he failed to rule on the motion. In State ex rel. McGinnis v. District Court (Mont. 1983), 673 P.2d 1207, 1208, 40 St.Rep. 1858, 1859, it is said:

> The purpose of Rule 42(b), M.R.Civ.P., is to provide a broad discretion in the District Court in the handling of the trial procedures. (Emphasis added.)

The judgment of the lower court cannot be sustained when the trial judge, under a mistake of fact, abdicated his responsibility to exercise his discretion in deciding a Rule 42(b) motion. Had he ruled on the merits of the motion he would have granted it, as he repeatedly said.

I do not agree with the majority opinion that Britton's case was tried only in tort. Under our system of notice pleading it is not possible to determine the issues simply by examination of the pleadings alone. Resort must also be had to other sources to resolve this question. In this cause it is clear that the case was prepared and tried first on the question of whether the insurance contract was breached and second as to whether bad faith was involved. The trial judge said so, as above noted, when in his order of June 28, 1984

46

he referred to ". . . the contract and tort claim." (Emphasis added.) Questions No. 3 and 4 of the jury verdict read as follows:

QUESTION NO. 3: What damages did Bill E. Britton incur as a result of the breach of the insurance contract by Farmers Insurance Group?

QUESTION NO. 4: Did Farmers Insurance Group (Truck Insurance Exchange) breach the implied-in-law covenant of good faith and fair dealing by its conduct in handling Bill E. Britton's claim? (Emphasis added.)

The instructions given to the jury were replete with references to the insurance contract. The briefs of the parties show that the case was prepared and tried on a contract and tort theory. This is also true of the interrogatories and the answers thereto. In the pretrial order of May 23, 1983, it is set forth that one of cross-claimant Britton's contentions is that he ". . . is entitled to his insurance proceeds pursuant to the insurance contract with Farmers.. . ." (Emphasis added.) In a July 17, 1983 order of the trial judge's predecessor which denied a motion for partial summary judgment, repeated references are made to the "insurance contract" and it is said: "To recover under the insurance policy, Britton has cross-claimed against Farmers Insurance Group." In FIG's brief filed on April 1, 1983, it is said:

In his responsive pleading Britton has stated a cross-claim against Farmers attempting to recover under a fire insurance policy issued by Farmers for a fire which occurred in Britton's horse arena located south of Ronan, Montana. Britton also claims damages for alleged bad faith on the part of Farmers, as well as violations of the Montana Unfair Claims Settlement Practices Act, § 33-18-201, et seq., MCA. (Emphasis added.)

There are many other instances shown in the record which substantiate the contract and tort theories upon which Britton's case was prepared and tried.

Granting separate trials under these facts would not have been reversible error. The trial court had "broad discretion." Its decision would not have been limited by the scope of the motion for separate trial by FIG.

Contrary to the majority opinion, the two claims were not so "inextricably woven" together that their bifurcation would have been reversible error. The case of State ex rel. Fitzgerald v. District Court (Mont. 1985), 703 P.2d 148, 42 St.Rep. 1061, cited by the majority as authority for their "inextricably woven" theory did not involve the question of separate trials for contract and bad faith claims but, rather, separate trials for liability and damages, an entirely different matter.

The trial judge relied upon an order of his predecessor judge which was never made. Thus, he failed to exercise his discretion when deciding a Rule 42(b) motion for bifurcation. The previous district judge had never ruled that the contract and tort actions should be tried together. As a consequence the trial judge did not consider this issue on its merits. He recognized that separate trials were justified but instead of granting a separate trial, mistakenly placed his reliance on a non-existing previous ruling by his predecessor district judge. I would reverse and remand the case to the lower court for separate trials in accordance with the repeatedly and emphatically expressed opinion of the trial judge that trial of the contract and bad faith claims should have been bifurcated.

Hon. Henry Loble, District
Judge, Sitting for Mr. Chief
Justice J. A. Turnage